**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Jessica L. Hunter
Nathan A. Rice*
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (914) 775-8862
jbm@wittelslaw.com
jlh@wittelslaw.com
nar@wittelslaw.com

**KHEYFITS BELENKY LLP**
Andrey Belenky
80 Broad Street, 5th Floor
New York, New York 10004
Telephone: (212) 203-5399
abelenky@kblit.com

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Proposed Class*
*\*Pro Hac Vice Application Forthcoming*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MAGDA SILVA** and **KIRK BURKE-HAMILTON,** on behalf of themselves and all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>**MPOWER ENERGY, LLC** and **MPOWER ENERGY NJ LLC**<br><br>          Defendants | Civil Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................ 1

PARTIES ....................................................................................................................... 4

JURISDICTION AND VENUE ..................................................................................... 11

FACTUAL ALLEGATIONS .......................................................................................... 12

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets ............... 12

    B.   Plaintiff Magda Silva's Dealings With Mpower ............................................... 23

    C.   Plaintiff Kirk Burke-Hamilton's Dealings With Mpower ................................. 41

    D.   Continuing Violation and Tolling ..................................................................... 41

CLASS ACTION ALLEGATIONS ................................................................................ 42

CAUSES OF ACTION .................................................................................................. 45

COUNT I: BREACH OF CONTRACT ........................................................................... 45

COUNT II: BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING ..................................................................... 47

COUNT III: VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349 ................................................................................................ 48

COUNT IV: VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349-D ............................................................................................ 53

COUNT V: VIOLATION OF MATERIALLY IDENTICAL
STATE CONSUMER PROTECTION LAWS ................................................................. 57

COUNT VI: UNJUST ENRICHMENT .......................................................................... 63

PRAYER FOR RELIEF ................................................................................................. 64

JURY DEMAND ........................................................................................................... 64

NOTICE TO ATTORNEY GENERAL AND OTHER
GOVERNMENT OFFICIALS ....................................................................................... 64

Plaintiffs Magda Silva and Kirk Burke-Hamilton, by their attorneys, Wittels McInturff Palikovic, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, and Kheyfits Belenky LLP bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendants Mpower Energy, LLC and Mpower Energy NJ LLC (hereinafter "Mpower" or "Defendants," unless otherwise noted) and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## <u>NATURE OF THE CASE</u>

1.      This action seeks to redress Mpower's deceptive and bad faith pricing practices that have caused tens of thousands of customers across the United States to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.      Mpower is an independent energy service company ("ESCO") that sells electricity and natural gas in deregulated energy markets across the United States.  Mpower has taken advantage of deregulation to exploit customers hoping to save on their energy costs.

3.      Specifically, Mpower's one-page form customer contract uniformly represents to customers that its monthly variable rate for electricity and natural gas is "based on market pricing and other factors including overhead and profitability, but is not tiled [sic] to any published index and does not have a cap.  The Variable Rate generally increases with weather fluctuations and extremes."

4.      Mpower's representations about its variable rate are false and deceptive, and designed to take advantage of customers' good faith and lack of knowledge about, and access to, accurate wholesale and retail energy pricing and cost information.  In reality, Mpower did not

provide its customers with prices based upon market pricing and the factors and costs included in its contract, but rather used a pricing methodology that focused on maximizing profits.

5.      In addition, Mpower engaged in further acts of deceptive and unlawful conduct that this lawsuit seeks to remedy.

6.      For example, Mpower's one-page form contract states that "Mpower offers premium 100% renewable energy."   This representation is also false.  Rather than producing renewable energy or procuring energy from renewable producers, Mpower simply supplies the exact same "brown" energy a customer's existing utility would supply and then purchases relatively inexpensive credits that represent the production of renewable energy by another entity.  The cost of these inexpensive credits, called "renewable energy credits" or "RECs," does not explain the excessive rates Mpower charges.

7.      Further, even if Mpower could use the purchase of RECs to market its brown energy as "100% renewable energy," Mpower did not even purchase enough RECs to offset 100% of the energy it sold to customers as being "100% renewable."  Moreover, of the limited RECs Mpower purchased, there were RECs for the wrong usage period, the wrong fuel type, and the wrong geography.   Any reasonable customer would understand that if Mpower purchased RECs to support its claim that it "offers premium 100% renewable energy," those RECs would correspond to the customer's geography, fuel type, and the time period in which Mpower's brown energy is being consumed.  In other words, if Mpower supposedly supplies "100% renewable" electricity to New York customers, the RECs it purchases should be for (i) the same type of energy the customer uses, (ii) energy for consumption in New York, and (iii) energy consumed during the same time period as the customer's usage of Mpower's "brown" energy.

Yet despite this, the RECs Mpower purchased included RECs for the wrong usage period, the wrong fuel type, and the wrong geography.

8.      Mpower also abused the information asymmetry between it and its customers and omitted material information from its marketing materials and customer communications.  For example, Mpower failed to adequately disclose (i) that Mpower's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges. Mpower also failed to adequately disclose (ii) the actual variable rate methodology that it uses to calculate a customer's monthly variable rate, and (iii) the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged.  Mpower similarly failed to provide customers (iv) adequate advance notice of the excessive variable rates it knew it would charge.

9.      As a result of Mpower's unlawful acts described herein, tens of thousands of unsuspecting customers have been, and continue to be, fleeced by Mpower out of millions of dollars in exorbitant energy charges.  Defendants' scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

10.     Plaintiffs and other Mpower customers (the "Class") have been injured by Defendants' unlawful practices.  Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Mpower's breach of contract, breach of the duty of good faith and fair dealing, violation of state consumer protection statutes, and/or unjust enrichment.

11.     Only through a class action can Mpower's customers remedy Defendants' ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge

Mpower's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, many customers do not realize they are victims of Mpower's deceptive and unlawful conduct. With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Mpower engage in fair and upright business practices.

## **PARTIES**

12.    Plaintiff Magda Silva resides in New York, New York. Ms. Silva signed up to receive electricity and natural gas from Mpower at a fixed rate on or around April 26, 2019, and she was switched to a variable rate in or around April of 2020. After she was switched to a variable rate, Mpower began charging a rate that was not based on the factors outlined in Mpower's one-page form customer contract but was instead much higher. Mpower also breached its contractual commitment to provide "100% renewable energy."

13.    As a result of Defendants' deceptive and otherwise improper, unlawful, and unauthorized conduct, Ms. Silva incurred excessive charges for electricity and natural gas.

14.    Plaintiff Kirk Burke-Hamilton resides in Washington, D.C. Mr. Burke-Hamilton signed up to receive electricity from Mpower in or around September 2021. Based on the billing data accessible to Mr. Burke-Hamilton and Mpower's representations to him, Mr. Burke-Hamilton appears to have been charged only fixed electricity rates by Mpower for its supposedly "100% renewable energy." Upon information and belief, the electricity Mpower provided Mr. Burke-Hamilton was not "100% renewable energy."

15.    As a result of Defendants' deceptive and otherwise improper, unlawful, and unauthorized conduct, Mr. Burke-Hamilton incurred excessive charges for electricity.

16.     Defendant Mpower Energy, LLC is a limited liability company headquartered and operated out of 24 Hillel Place, Brooklyn, New York 11210.  On information and belief, Mpower Energy, LLC's membership consists of two individual members: Lavie Popack and Joseph Popack, both of whom are citizens of New York.  Thus, Mpower Energy, LLC is a citizen of New York.  Mpower Energy, LLC and its operating affiliate Defendant MPower Energy NJ LLC market and/or sell electricity and natural gas to residential and commercial customers in New York, Illinois, Maryland, New Jersey, Ohio, Pennsylvania, and Washington D.C.  Mpower Energy, LLC and its operating affiliate MPower Energy NJ LLC both work out of the same office in Brooklyn and are owned and operated by the same people.

17.     Defendant MPower Energy NJ LLC is a limited liability company headquartered and operated out of 24 Hillel Place, Brooklyn, New York 11210.  MPower Energy NJ LLC's membership consists of two individual members: Lavie Popack and Joseph Popack, both of whom are citizens of New York.  Thus, MPower Energy NJ LLC is a citizen of New York.  MPower Energy NJ LLC markets and/or sells electricity and natural gas to residential and commercial customers in New York and other states.  Specifically, MPower Energy NJ LLC and its affiliate Defendant MPower Energy, LLC market and/or sell electricity in New York, Illinois, Maryland, New Jersey, Ohio, Pennsylvania, and Washington D.C.

18.     Upon information and belief, Defendant Mpower Energy, LLC completely controls its operating affiliates, including Defendant MPower Energy NJ LLC.  Public data show that Mpower Energy, LLC and MPower Energy NJ LLC hold themselves out as a single company—Mpower Energy.[1]  There is a unified executive team that controls all operational and

---

[1] Who are we?, MPOWER ENERGY, https://mpowerenergy.com/about_page.html (last visited Nov. 7, 2023).

financial aspects of both Defendants, which are run on a consolidated basis as one company. Defendant Mpower Energy, LLC uses its operating affiliates, including Defendant Mpower Energy NJ LLC to perpetrate the unlawful conduct challenged in this lawsuit. Upon information and belief, Mpower Energy, LLC reports its operating affiliates' earnings and losses in a consolidated format.

19.    Mpower Energy NJ LLC is Mpower Energy, LLC's agent outside of New York and has apparent authority to act on Mpower Energy, LLC's behalf. Mpower Energy, LLC and Mpower Energy NJ LLC use the same corporate logo and share the same principal place of business. On information and belief, Mpower Energy NJ LLC has no separate offices. On information and belief, Mpower Energy NJ LLC does not have its own management or employees. Instead, the about us page of Mpower's website[2] lists a dozen executives of "Mpower" that are employees of Mpower Energy, LLC but run the day-to-day affairs of both Defendants without regard to any distinction between corporate entities. Mpower's LinkedIn page states that it has been "providing reliable energy to communities in the Northeast region since 2009," without any reference to the fact that MPower Energy NJ LLC is used by Mpower Energy, LLC in its operations outside of New York.[3] Mpower's LinkedIn page also lists Mpower's employees and does not distinguish between MPower Energy NJ LLC and Mpower Energy, LLC.[4] Other sources corroborate that there is no distinction between the employees of MPower Energy NJ LLC and Mpower Energy, LLC.[5] In an October 18, 2023 filing in the

---

[2] *Id.*

[3] *See* Mpower Energy, LinkedIn, https://www.linkedin.com/company/mpower-energy (last visited Nov. 7, 2023).

[4] *Id.*

[5] *See* Mpower Energy Information, ROCKETREACH, https://rocketreach.co/mpower-energy-

United States District Court for the District of New Jersey, MPower Energy NJ LLC admitted that "[n]one of the employees referenced [in the exact internet citations above, including the Mpower website] work for Mpower Energy NJ LLC . . . ."[6]

20.     MPower Energy, LLC's officers are also MPower Energy NJ LLC's officers.  For example, Lavie Popack is listed as MPower Energy NJ LLC's CEO on various public filings: "Lavie Popack also serves as CEO of Mpower Energy NJ LLC and Joseph Popack serves as President of Mpower Energy NJ LLC.  The same two individuals are also the sole owners of MPower Energy, LLC, which has guaranteed the obligations of MPower Energy NJ LLC."[7]  On information and belief, Yael Dubrovsky is a Compliance Manager for MPower Energy, LLC.  Yael Dubrovsky also presents herself as a Compliance Officer for MPower Energy NJ LLC.[8]  David G. Combs signs letters on behalf of both MPower Energy, LLC and MPower Energy NJ LLC.[9]  Peretz Lezell is a Chief Operating Officer of MPower Energy, LLC and he also presents himself as a Chief Operating Officer of MPower Energy NJ LLC.[10]  Paul Hoffman is a Director of Legal and Regulatory Affairs of MPower Energy, LLC and he also presents himself as a

---

profile_b5e2a138f42e6385 (last visited Nov. 7, 2023); *see also* Mpower Energy, Owler, https://www.owler.com/company/mpowerenergy (last visited Nov. 7, 2023).

[6] *Rhymes v. MPower Energy NJ LLC*, No. 23-cv-02556, ECF No. 52 at 4 (D.N.J. Oct. 18, 2023).

[7] Letter from Paul Hoffman, Director of Legal Affairs, Mpower Energy, LLC, to Ill. Com. Comm'n, at 3 (Jan. 29, 2021) ("Re: Annual Report – ICC Docket No. 17-0416 and 17-0417").

[8] MPower Energy NJ LLC, Application to Offer, Render, or Supply Electricity or Electric Generation Services, Penn. Pub. Util. Comm'n, Ex. 1 at 26 (Aug. 11, 2015).

[9] Letter from David G. Combs, Dep't of Legal and Regul. Affairs, Mpower Energy, LLC, to N.Y. Dep't of Public Service (Oct. 11, 2023) ("Matter #14-02554 – Request for Confidentiality – Trade Secret").

[10] Affidavit of Peretz Lezell, Conn. Agencies Reg. Sec. 16-245-3(c) (Feb. 10, 2021); Affidavit of Peretz Lezell, Annual Section 16-115D(i) Compliance Report, Ill. Com. Comm'n (Aug. 30, 2023).

Director of Legal and Regulatory Affairs of MPower Energy NJ LLC.[11]  David G. Combs, presents himself as an attorney in the Department of Legal and Regulatory Affairs of both MPower Energy, LLC and MPower Energy NJ LLC.[12]  In public filings, when describing expertise related to electric and natural gas third party supply, MPower Energy NJ LLC refers to collective expertise of "MPower companies."[13]

21.    When Defendants issue news releases about "Mpower's" activities outside of New York, they do so under the Mpower Energy brand and quote Lavie Popack as the "CEO of Mpower Energy."[14]  On information and belief, Mpower Energy NJ LLC does not have its own payroll.  On information and belief, to the extent Mpower Energy NJ LLC maintains any corporate policies, those policies were developed and implemented by Mpower Energy, LLC's management and employees.  On information and belief, MPower Energy NJ LLC does not own real property.  On information and belief, MPower Energy NJ LLC does not advertise itself as an independent entity or have a website.  Rather, customers sign up with "Mpower" through co-Defendant Mpower Energy, LLC's advertisements, sales staff, independent sales contractors, and website.  Mpower's website was registered by Mpower CEO Lavie Popack in or around 2016-

---

[11] Letter from Paul Hoffman, Dir. of Legal Affairs, Mpower Energy, LLC, to Ill. Com. Comm'n (Mar. 30, 2021) ("Annual Dekatherm Report for Mpower Energy NJ LLC"); Mpower Energy, LLC, Renewal Application for Current Licensees Supply Electricity and Natural Gas, or Electric Generation and/or Natural Gas Supply Services to the Public in the District of Columbia, at 5 (Sep. 2, 2022).

[12] Letter from David G. Combs, Dep't of Legal and Regul. Affairs, Mpower Energy, LLC, to D.C. Pub. Serv. Comm'n (June 8, 2023) ("Amended Order No. 16466 – Mpower Energy NJ LLC's Fuel Miz and Emission Disclosure Reports").

[13] Letter from Paul Hoffman, Dir. of Legal Affairs, Mpower Energy, LLC, to Ill. Com. Comm'n, at 7 (Jan. 29, 2021) ("Re: Annual Report – ICC Docket No. 17-0416 and 17-0417").

[14] *See, e.g.*, Press Release, Mpower Energy, Mpower Energy Now Bringing Clean & Renewable Energy to Columbus Ohio (Feb. 21, 2019), *available at* https://www.prnewswire.com/news-releases/mpower-energy-now-bringing-clean--renewable-energy-to-columbus-ohio-300799769.html (last visited Nov. 7, 2023).

17.[15]   Mr. Popack gave a New York address for Mpower located in New York's Nassau

County.[16]   On information and belief, all Mpower marketing directed at customers in New York,

Illinois, Maryland, New Jersey, Ohio, Pennsylvania, and Washington D.C. was created by or on

behalf of Mpower Energy, LLC.  On information and belief, Mpower Energy, LLC is fully

aware that MPower Energy NJ LLC has apparent authority to act on Mpower Energy, LLC's

behalf.

22.     On information and belief, MPower Energy NJ LLC possesses actual authority to

act on Mpower Energy, LLC's behalf outside of New York.  On information and belief, Mpower

Energy, LLC's management, employees, or other individuals or entities contracted by Mpower

Energy, LLC drafted the customer contract at issue in this litigation and are responsible for the

misrepresentations and omissions at issue in this litigation.  On information and belief, Mpower

Energy, LLC caused Defendants to breach their contracts with Plaintiffs and the Class.

23.     On information and belief, MPower Energy NJ LLC is entirely dominated by

Mpower Energy, LLC.  For example, MPower Energy NJ LLC provided the Public Service

Commission of the District of Columbia a bond certificate in the name of MPower Energy,

LLC.[17]  On information and belief, MPower Energy NJ LLC observes no corporate formalities.

On information and belief MPower Energy NJ LLC keeps no independent corporate records or

minutes and has no officers or directors elected in accordance with its by-laws.  On information

and belief Mpower Energy, LLC commingles assets with MPower Energy NJ LLC.  For

example, Lavie Popack stated "[b]oth individual members [Lavie Popack and Joseph Popack]

---

[15] Whois History Overview, WHOISXML API, https://whois-history.whoisxmlapi.com/, at 123 (last visited Nov. 7, 2023).

[16] *Id.*

[17] License & Bond, MPower Energy, LLC and D.C. Pub. Serv. Comm'n, at 2 (Apr. 26, 2019).

and their commonly-owned entity, MPower Energy, LLC, have guaranteed the debts of MPower Energy NJ LLC."[18]  On information and belief, Mpower Energy, LLC pays all of MPower Energy NJ LLC's bills.  On information and belief, MPower Energy NJ LLC has no assets and passes all revenues to Mpower Energy, LLC.  On information and belief, MPower Energy NJ LLC does not own real property.  On information and belief, any real property owned by Defendants is owned by Mpower Energy, LLC or other entities controlled by Mpower Energy, LLC or the members of Mpower Energy, LLC.  On information and belief, MPower Energy NJ LLC's marketing and sales data are not recorded independently but are treated as part of Mpower Energy, LLC's marketing and sales data.  For example, in 2014, the terms and conditions for purchase and sale of the electricity and natural gas provided by MPower Energy NJ LLC in New Jersey bore the indication of copyright registration by Mpower Energy, LLC.[19]  The same document states that "MPower Energy, LLC"—not MPower Energy NJ LLC—"is licensed by the Public Service Commission to sell Electricity and Natural gas in New Jersey."[20]  On information and belief, MPower Energy NJ LLC does not have an independent marketing and sales department and does not utilize marketing and sales software for its sole benefit.  Instead, on information and belief, Mpower Energy, LLC's marketing and sales channels and software are used for soliciting consumers.

24.    In sum, MPower Energy NJ LLC is a shell company through which Mpower Energy, LLC operates outside of New York.  MPower Energy NJ LLC is Mpower Energy,

---

[18] MPower Energy NJ LLC, Ill. Com. Comm'n Docket No. 17-0416, Verified Response to Administrative Law Judge's Ruling, at 1 (Nov. 16, 2017).

[19] Mpower Energy, LLC, Terms and Conditions of Agreement (2014).

[20] *Id.*

LLC's agent outside of New York with authority to bind customers in Illinois, Maryland, New Jersey, Ohio, Pennsylvania, and Washington D.C. to Mpower's customer contract.

25.     All of the relevant acts complained of took place in New York: Mpower processes all enrollment transactions and payments in New York; directs all marketing, billing, customer outreach, service, and tracking efforts from New York; develops, updates, and operates its website from its Brooklyn office, including all portions of its website that solicit and enroll customers and collect their payment information; receives all payments from Plaintiffs and Class Members and maintains a bank account in New York.  For example, MPower Energy NJ LLC sent a refund to one of its Pennsylvania customers from a New York bank listing its Brooklyn address.[21]   Further, Mpower maintains its only U.S. office in New York, which is where all its major business decisions, including decisions regarding the advertising, marketing, and sale of Mpower's electricity supply services, are made.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

26.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

27.     At least one member of the Class is a citizen of a state other than New York or is a citizen of a foreign state.

### *General Personal Jurisdiction*

28.     This Court has General Personal Jurisdiction over Defendants because their

---

[21] MPower Energy NJ LLC, Aff. and Refund Check to Penn. Customer (Mar. 13, 2023).

members are citizens of this state, they are headquartered in this state, and they advertise, market, distribute, and sell energy to New York customers.

*Venue*

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District.  Among other things, from 2019 through 2023, Mpower supplied electricity and natural gas to Plaintiff Silva's residence in New York City.

## FACTUAL ALLEGATIONS

**A.     The History Of Deregulation And ESCOs' Role In Energy Markets**

30.     In the 1990s, numerous state legislatures and state regulatory agencies, including the New York Public Service Commission ("NYPSC"), deregulated the market for retail energy supply.  Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay.  As a result, the energy supply market is open to competition, and customers and small businesses may choose their energy supplier.

31.     Since New York opened its retail energy markets to competition, millions of New York residential and small business customers have switched to an ESCO.  Deregulation laws in other states are substantially similar.

32.     ESCOs, the new energy suppliers, compete primarily against local utilities.  ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user customers.  However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity.  Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer.  ESCOs merely buy energy and then sell that energy to end-users with a mark-up.  Thus, ESCOs are essentially

brokers and traders: they neither produce nor deliver energy, but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply. The only value that ESCOs add in the energy markets is their ability to reduce costs to customers like Plaintiffs. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

33.     ESCOs are subject to minimal regulation by state utility regulators like the NYPSC. ESCOs like Mpower do not have to file their rates, or the method by which those rates are set, with regulators.

34.     Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility. For example, in New York, as in many states, the utilities charge energy supply rates that reflect the same supply costs ESCOs like Mpower incur. This is because the utilities' rates pass on the utilities' energy supply cost from the New York Independent System Operator's ("NYISO") competitive short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale energy and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as Mpower incur). New York utilities purchase energy, ancillary services, and capacity daily from NYISO's wholesale market based on customer consumption and pass actual costs on to their customers.

35.     ESCOs like Mpower can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices.

36.    Indeed, ESCOs such as Mpower have more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail customer; or purchasing energy in advance of the time it is used by customers, for example by purchasing futures contracts for the delivery of energy in the future at a predetermined price. The fundamental purpose of deregulation was to allow ESCOs to use these and other innovative purchasing strategies to reduce energy acquisition costs and pass those savings on to customers.

37.    Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Mpower's variable rates are consistently and substantially higher than local utilities' rates and wholly detached from Mpower's costs; accordingly, no customer would ever agree to Mpower's variable rate if they knew the truth. The only way Mpower can retain variable rate customers is by hiding the fact that the primary driver of the variable rate is not Mpower's actual costs, but Mpower's unbridled price gouging and profiteering.

38.    Mpower took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates for electricity and natural gas. In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, Mpower exploits deregulated markets by consistently charging its customers far more than the local utility for the same energy and failing to adequately disclose how its variable rates are determined.

39.    One of deregulation's main unintended consequences has been the proliferation of ESCOs like Mpower whose business model is primarily based on taking advantage of customers. As a result of this widespread misconduct, states like New York began enacting post-

deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers."[22]  As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct Plaintiffs challenge here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity.  Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.
>
> * * *
>
> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, short-term "teaser" rates followed by skyrocketing variable prices—many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas.  The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.[23]

40.    New York regulators also began to call out the high levels of misconduct that pervaded the state's deregulated energy markets.  For example, in 2014 the NYPSC concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[24]  The NYPSC further noted "it is extremely difficult for mass market retail energy customers to access pricing

---

[22] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 1 (2009).

[23] *Id.* at 3–4.

[24] NYPSC, CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 4 (Feb. 25, 2014).

information relevant to their decision to commence, continue or terminate service through an

ESCO."[25]  The NYPSC concluded that:

> [A]s currently structured, the retail energy commodity markets for
> residential and small nonresidential customers cannot be considered
> to be workably competitive.  Although there are a large number of
> suppliers and buyers, and suppliers can readily enter and exit the
> market, the general absence of information on market conditions,
> particularly the price charged by competitors, is an impediment to
> effective competition[.][26]

41.     Statistics from the New York Attorney General's ("NYAG") office confirm the

pattern of activity this class action seeks to combat.  From at least the year 2000 to the present,

the NYAG has investigated numerous ESCOs' deceptive and illegal business practices.  These

investigations have resulted in multiple settlements providing for extensive injunctive relief and

millions in restitution and penalties.

42.     The unlawful conduct of ESCOs like Mpower has been devastating to New York

customers.  For example, "[a]ccording to the data provided by [New York's] utilities, the

approximately two million New York State residential utility customers who took commodity

service from an ESCO collectively paid almost $1.2 billion more than they would have paid if

they purchased commodity from their distribution utility during the 36-months ending December

31, 2016."[27]  "Additionally, small commercial customers paid $136 million more than they

would have paid if they instead simply remained with their default utilities for commodity supply

for the same 36-month period."[28]  Combining these two groups, New York customers have been

---

[25] *Id*. at 11.

[26] *Id*. at 10.

[27] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2 (Mar. 30, 2018).

[28] *Id.* at 3.

"'overcharged' by over $1.3 billion dollars over this time period."[29]

43.    New York's low-income customers have also been hit hard.  The utilities reported that low-income ESCO customers (a subset of the residential customers mentioned above) "collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility."[30]

44.    On December 16, 2016, based on the flood of customer complaints, negative media reports, and data demonstrating massive overcharges, the NYPSC prohibited ESCOs from serving low-income customers, because of "the persistent ESCO failure to address (or even apparently to acknowledge) the problem of overcharges to [low income] customers[.]"[31]

45.    Following the first part of the evidentiary hearing announced in December 2016, on March 30, 2018, NYPSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.  Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable.[32]

> * * *

> The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to

---

[29] *Id.*

[30] *Id.*

[31] NYPSC, CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

[32] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 1 (Mar. 30, 2018).

the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service. Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers. For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[33]

\* \* \*

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[34]

46.     As for the ESCOs' claim that their marketing and overhead costs explain the

overcharges, NYPSC staff found that these costs do "not justify the significant overcharges"

---

[33] *Id.* at 41–42 (citations omitted).

[34] *Id.* at 86 (citations omitted).

ESCOs levied.[35]  Likewise, when the ESCOs claimed that their provision to customers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "the cost incurred . . . in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[36]

47.    Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[37]  The NYPSC staff went on to state that "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a "green" commodity product."[38]

48.    Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers.  These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by

---

[35] *Id.* at 37.

[36] *Id.* at 87.

[37] *Id.* at 69.

[38] *Id*. at 69–70.

the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[39]

49.    Then, on December 12, 2019, the NYPSC issued bombshell regulatory changes

that banned, starting in February 2020, the variable rate pricing practices engaged in by Mpower

and impacting the entire New York ESCO marketplace.[40]

50.    The NYPSC's press release announcing the new regulations stressed that banning

variable energy rates was intended to "prevent[] bad actors among ESCOs from overcharging

New York consumers" and that the regulations only went forward after "the state's highest court

definitively halted ESCOs' attempts to use litigation to evade and/or delay consumer-protection

regulation."[41]  The regulations themselves likewise condemn ESCOs' conduct and declare that

deception has become a "business model" in the deregulated energy market:

> Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO customers that pay significant premiums for products with little or no apparent added benefit, . . . it appears that a material level of misleading marketing practices continues to plague the retail access market.

* * *

---

[39] *Id.*

[40] NYPSC, CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 108–10 (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}(last visited Nov. 7, 2023).

[41] Press Release, NYPSC, PSC Enacts Significant Reforms to the Retail Energy Market (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7B2F86EF23-5B31-46D3-846D-DAD7C0D7381A%7D (last visited Nov. 7, 2023).

> The persistence of complaints related to ESCO marketing practices
> is indicative of some ESCOs continuing to skirt rules and attempting
> to avoid accountability as part of their business model.[42]

51.     The NYPSC's variable rate ban followed its two-year investigation of ESCO practices that culminated in a ten-day evidentiary hearing to examine evidence submitted by 19 parties, and to hear the testimony and cross-examination of 22 witnesses and witness panels.[43]

52.     The NYPSC prefaced the variable rate ban with the observation that variable energy rates like those Defendant charged Ms. Silva and Class Members are "[t]he most commonly offered ESCO product" and that this popular product is frequently provided at "a higher price than charged by the utilities."[44]  The incongruity of customers paying ESCOs more for the exact same energy offered by regulated utilities was not lost on the NYPSC:

> If market participants are unwilling, or unable, to provide material
> benefits to consumers beyond those provided by utilities in
> exchange for a regulated, just and reasonable rate, the market serves
> no proper purpose and should be ended.[45]

53.     In fact, the NYPSC found it "troubling" that even after considering reams of evidence, "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified."[46]  This fact only highlighted the NYPSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices."[47]  Accordingly, and on this record,

---

[42] December 12 Order at 88–90.

[43] *Id.* at 3–4.

[44] *Id.* at 11.

[45] *Id.* at 12.

[46] *Id.* at 30.

[47] *Id.* at 31.

the NYPSC banned variable energy rates like those Defendants charged Ms. Silva and Class Members.[48]  In place of these floating variable rates, the NYPSC required ESCOs to guarantee that their variable rates would save customers money compared to what the utility would have charged.[49]  Under the new regulations, if the ESCO charges the customer more than the utility, the customer is owed a refund for the difference.[50]  In this litigation, the difference between what Mpower charged customers for the same energy Class Members' utilities would have supplied, and what the utilities would have charged for that energy is likely in the tens of millions of dollars.

54.     Moreover, the NYPSC's findings of widespread and unjustified overcharging underscore and highlight the importance and perniciousness of Defendants' practices challenged in this lawsuit.  Likewise, the NYPSC's finding that ESCOs' overcharging is completely unjustified bolsters Plaintiffs' claims that Defendants' variable rate pricing practices breached the duty of good faith and fair dealing.  ESCOs' improper pricing practices go undetected because it is virtually impossible for customers to ferret out the fact that they are being overcharged.

55.     In its December 12 Order, the NYPSC also faulted ESCOs for concealing critical pricing data from both ordinary customers ***and the NYPSC itself***: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[51]

---

[48] *Id.* at 39.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 31.

56.     The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[52] and required that ESCO bills show how much the customer's utility would have charged.[53]

57.     In addition, just recently and in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[54]  The legislation was introduced after reports that ESCOs in New York, like Mpower, charge some of the highest residential energy costs in the United States.[55]

58.     New York is not the only state using the overwhelming evidence of customer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices.

**B.     Plaintiff Magda Silva's Dealings With Mpower**

59.     On or around April 26, 2019, an Mpower salesperson solicited Ms. Silva to switch her electricity and natural gas accounts for her home on Manhattan's Upper West Side.  On April 26, 2019, Ms. Silva saw and signed Mpower's pre-printed one-page contract that is attached hereto as **Exhibit A**.  The one-page contract refers to itself as "the contract" and states that Ms. Silva's electricity will be supplied by Mpower for 12 months at a fixed rate of $0.129/kwh.  *Id.*

---

[52] *Id.* at 33.

[53] *Id.* at 33–34.

[54] Press Release, Governor Kathy Hochul, Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills (Sept. 20, 2023),  *available at* https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills (last visited Nov. 7, 2023).

[55] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

The contract states that Ms. Silva's natural gas will be supplied by Mpower for 12 months at a fixed rate of $0.69/therm. The contract also states that at the end of the 12-month period:

> the contract will continue at a Variable Rate determined on a monthly basis until terminated by either party, or unless renewed at a Fixed Rate. Variable Rate - energy is charged at a rate determined monthly based on market pricing and other factors including overhead and profitability, but is not tiled [*sic*] to any published index and does not have a cap. The Variable Rate generally increases with weather fluctuations and extremes.

60. The one-page contract further promises that "Mpower offers premium 100% renewable energy."

61. The one-page contract does not incorporate any other documents by reference or express an intent to make any separate, future terms a part of the contract.

62. After both Ms. Silva and Mpower signed Mpower's contract and agreed to the one-page contract's terms, Ms. Silva was sent an unsolicited email from the address "save@mpowerenergy.com" with the subject line "Your Contribution to a Sustainable Future." The email appears to a reasonable person as a marketing email, and it does not mention any additional contract terms or conditions. The email's layout is dominated by marketing images like Mpower's logo and a very large version of the below image:



63.    Just above the large image of this verdant hillside is the email's text, which

consists of only the following limited statements that do not reference the contract Ms. Silva

signed or the terms of that agreement.  No reasonable person would understand this unsolicited

email to pertain to or purport to amend the contract Ms. Silva and Mpower had already signed, or

to relate in any way to the terms of any agreement between the parties.

> April 26, 2019
> Magda Silva
> ████████████████
> NEW YORK, NY 10024
>
>
> Congratulations! You are now receiving 100% renewable energy from Mpower Energy
> and making your impact on improving the environment.
> To ensure exemplary service, you will receive a call from our Customer Satisfaction
> department; they are calling to confirm that you received Mpower's best in class
> customer service.
> Now that you're a member of Mpower, you'll still get your bill from your utility, but
> Mpower will be listed on your bill as the energy supplier.
> Although many customers want the immediate benefits of renewable energy, the switch
> will take effect on the beginning of your next billing cycle. Meaning that from the
> beginning of your next billing cycle, you will start receiving 100% renewable energy.
>
> Feel great about the positive impact you're making in your community!
> Kind Regards,
> **The MPower Energy Team**

64.    Nothing in this email suggests that it is intended to amend the contract Ms. Silva

had already signed and Mpower's agent had countersigned.

65.    On or around April 26, 2019, or soon thereafter, Mpower began supplying

electricity and natural gas to Ms. Silva's residence at a fixed rate.  The energy Mpower supplied

was not "100% renewable energy."

66.    In or around April of 2020, Mpower switched Ms. Silva to a variable rate.  Ms.

Silva continues to receive electricity and natural gas from Mpower at a variable rate.  The energy

Mpower has been supplying Ms. Silva since April 2020 has not been "100% renewable energy."

67.     Mpower also represents to its customers in its form customer contract that its variable rate for electricity and natural gas "is charged at a rate determined monthly based on market pricing and other factors including overhead and profitability, but is not tiled [*sic*] to any published index and does not have a cap.  The Variable Rate generally increases with weather fluctuations and extremes."

68.     Upon information and belief, Ms. Silva was subject to the same contractual terms regarding Mpower's variable rate and/or promising "100% renewable energy" as thousands of Mpower's other customers in the United States.

69.     In light of Mpower's representations, any reasonable customer, including Ms. Silva, would reasonably expect that a rate "based on market pricing" means that Mpower's rates are "based on" Mpower's electricity supply costs and that the "other factors including overhead and profitability" constitute a reasonable fixed markup added to Mpower's supply costs to incorporate Mpower's profit margin and overhead.  This understanding is reinforced by the sentence that "[t]he Variable Rate generally increases with weather fluctuations and extremes" as such fluctuations affect Mpower's supply costs but not its overhead or the fixed profit margin that follows from a rate that is "based on market pricing."

70.     Unfortunately, Mpower did not provide its customers with a rate based on its costs plus a reasonable margin.  Instead, Mpower charged its customers variable rates that were untethered from its costs to maximize its own profits.

71.     Publicly available data on the energy procurement costs of local utilities, like Consolidated Edison ("ConEd") (the utility serving Ms. Silva's residence), serve as an ideal indicator of the wholesale cost of energy and the other applicable market-based costs that constitute "market pricing" under Mpower's customer contract.   This is because the utilities'

energy procurement costs are the same costs ESCOs like Mpower incur.  Not only are local

utilities Mpower's primary competitors (as utilities always are), but utilities' procurement costs

are the best indicator of "market pricing."  Utilities' procurement costs track the competitive

short-term public market (also known as "real-time" pricing or the "spot market") for energy and

the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the

same costs ESCOs such as Mpower incur).  In other words, utilities like ConEd purchase energy

for their customers on an open free market and pass those costs onto customers.  Mpower could

do the same.  Consequently, local utilities' supply costs are the ideal comparator here because

the utilities are Mpower's primary competitors and their supply costs represent market prices for

energy.

72.     In fact, Mpower has a tactical advantage over the utilities as it can purchase

energy from highly competitive markets for future use, and, therefore, its costs for purchasing

energy should at the very least reflect (if not undercut) market prices, albeit over a longer term.

Therefore, while Defendants' supply costs may not perfectly match the utilities' supply costs in

any given month, they should be commensurate, as they are both based on market forces.  Using

the utility's supply costs as a benchmark for Mpower's supply costs shows that Mpower's rates

were driven by excessive mark ups and profiteering.

73.     The following table compares Ms. Silva's variable electricity supply rates from

Mpower for 14 billing periods from May 2022 to July 2023, to ConEd's contemporaneous

supply cost.

| Billing Period | Mpower Rate ($/KWh) | ConEd Supply Cost ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 05/31/2022–06/29/2022 | 0.199 | 0.097 | 2.06x | 106% |
| 06/29/2022–07/29/2022 | 0.219 | 0.100 | 2.18x | 118% |
| 07/29/2022–08/29/2022 | 0.219 | 0.093 | 2.36x | 136% |
| 08/29/2022–09/28/2022 | 0.219 | 0.092 | 2.37x | 137% |
| 09/28/2022–10/27/2022 | 0.219 | 0.080 | 2.73x | 173% |
| 10/27/2022–11/30/2022 | 0.199 | 0.020 | 10.13x | 913% |
| 11/30/2022–12/29/2022 | 0.199 | 0.112 | 1.77x | 77% |
| 12/29/2022–01/31/2023 | 0.199 | 0.134 | 1.49x | 49% |
| 01/31/2023–03/02/2023 | 0.199 | 0.117 | 1.70x | 70% |
| 03/02/2023–03/31/2023 | 0.199 | -0.048[56] | N/A | N/A |
| 03/31/2023–04/28/2023 | 0.189713 | 0.010 | 19.52x | 1852% |
| 04/28/2023–05/30/2023 | 0.189 | 0.088 | 2.15x | 115% |
| 05/30/2023–06/28/2023 | 0.199 | 0.121 | 1.64x | 64% |
| 06/28/2023–07/28/2023 | 0.199 | 0.136 | 1.46x | 46% |

74.    The "Overcharge Factor" and "Overcharge Percentage" columns in the chart above demonstrate the drastic difference between Mpower's rates for Ms. Silva's electric account and ConEd's contemporaneous supply costs.  Notably, Mpower's rates were *frequently* more than double ConEd's supply costs over this fourteen-month period.

---

[56] ConEd's supply costs during the March 2023 billing period were negative due to an overcharging in a prior month.  All calculations in this complaint take the net impact of this overcharging into account.

75.    An analysis of Mpower's natural gas pricing reveals a similar practice of levying excess margins and charging rates that are untethered to Mpower's supply costs.  The following table compares Ms. Silva's variable natural gas supply rates from Mpower for 14 billing periods from May 2022 to July 2023, to ConEd's contemporaneous supply cost.

| Billing Period | Mpower Rate ($/therm) | ConEd Supply Cost ($/therm) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 05/31/2022–06/29/2022 | 1.20 | 0.950 | 1.26x | 26% |
| 06/29/2022–07/29/2022 | 1.40 | 0.802 | 1.75x | 75% |
| 07/29/2022–08/29/2022 | 1.40 | 0.944 | 1.48x | 48% |
| 08/29/2022–09/28/2022 | 0.219[57] | 0.977 | N/A | N/A |
| 09/28/2022–10/27/2022 | 0.219[58] | 0.753 | N/A | N/A |
| 10/27/2022–11/30/2022 | 1.40 | 0.627 | 2.23x | 123% |
| 11/30/2022–12/29/2022 | 1.40 | 0.761 | 1.84x | 84% |
| 12/29/2022–01/31/2023 | 1.40 | 1.000 | 1.40x | 40% |
| 01/31/2023–03/02/2023 | 1.40 | 0.821 | 1.71x | 71% |
| 03/02/2023–03/31/2023 | 1.40 | 0.669 | 2.09x | 109% |
| 03/31/2023–04/28/2023 | 1.40 | 0.427 | 3.28x | 228% |
| 04/28/2023–05/30/2023 | 1.02 | 0.384 | 2.66x | 166% |
| 05/30/2023–06/28/2023 | 1.09 | 0.367 | 2.97x | 197% |
| 06/28/2023–07/28/2023 | 1.09 | 0.382 | 2.86x | 186% |

---

[57] This anomalously low rate appears to be the result of an Mpower billing error, as it is the same as the rate Mpower charged for electricity during this billing period.  $0.219/therm is less than ⅙ of the rate charged by Mpower in the preceding and succeeding billing periods.

[58] This anomalously low rate appears to be the result of an Mpower billing error, as it is the same as the rate Mpower charged for electricity during this billing period.  $0.219/therm is less than ⅙ of the rate charged by Mpower in the preceding and succeeding billing periods.

76.     As with Ms. Silva's electricity account, the overcharge columns demonstrate the drastic difference between Mpower's rates for Ms. Silva's natural gas account and ConEd's contemporaneous costs.  Mpower's rates were *frequently* more than double, and sometimes triple, ConEd's costs over this fourteen-month period.

77.     ConEd's supply costs are a reasonable, pre-discovery benchmark of Mpower's costs.  As explained above, ConEd is Mpower's primary competitor in Ms. Silva's service territory, and its supply costs reflect the market price of energy and associated costs over time (the same costs that ESCOs like Mpower incur), making the utility's supply costs an ideal stand in for Mpower's costs.

78.     Mpower did not adequately disclose to Ms. Silva that its variable energy rates are consistently and significantly higher than the rates ConEd charges.

79.     Mpower likewise failed to adequately disclose to Ms. Silva that in paying Defendants' variable energy rates, she received no added material benefit at a dramatically higher price than if she had bought her energy from her local utility (even accounting for REC costs).

80.     No reasonable customer, including Ms. Silva, would expect an ESCO's variable rate to be artificially inflated beyond any resemblance to the local utility's costs.  Indeed, the fact that Mpower's energy rates were so much higher than a reasonable benchmark of Mpower's costs demonstrates the extent of Mpower's price gouging.

81.     Mpower knew that its variable rates were consistently and significantly higher than the local utility's rates yet did not disclose this fact to customers.

82.     Defendants' failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any customer choosing an energy supplier is price; energy is a fungible commodity.

83.     Moreover, Defendants at no time alerted or informed Ms. Silva that the cost for energy would be ***continuously and significantly*** higher than the same energy sold by ConEd.

84.     Mpower lulled customers into purchasing its energy supply via material omissions about its variable energy rates.  Defendants did so to reap excessive profits at the expense of unsuspecting customers.  Defendants acted with actual malice, or with wanton and willful disregard for customers' well-being.

85.     A comparison of Mpower's rates to prevailing market costs also demonstrates that Mpower does not charge a rate based on the factors it promised.

86.     The tables below, *see* ¶¶ 89, 93, identify (i) fourteen billing periods during which Ms. Silva was charged Mpower's variable electricity and natural gas rates, (ii) the variable rate Mpower charged Ms. Silva, (iii) the corresponding "Market Supply Costs," and (iv) the differences between Mpower's rates and the contemporaneous Market Supply Costs.

87.     The Market Supply Costs below are based on the costs that ESCOs like Mpower incur supplying a retail customer in Ms. Silva's utility area for each period.  The Market Supply Costs for electricity include the weighted day-ahead NYISO electricity prices in Ms. Silva's utility zone, ancillary services costs, capacity costs, and various relatively small charges related to the NYISO (all costs that would be included in Mpower's contractual formula).  These charges are tracked by NYISO's Market Monitor, the external consultant that independently evaluates the New York wholesale electricity market.  NYISO's Market Monitor is appointed pursuant to NYISO's Federal Energy Regulatory Commission regulation and tariff.

88.    The Market Supply Costs represent the market costs and other factors that determine the costs that Mpower and other ESCOs incur in providing energy to retail customers. Each of these measures reflects the costs that Mpower's competitors, in the regulated or deregulated markets, incur.  That Mpower's rates are so vastly different from the utility's costs or the Market Supply Costs demonstrates that Mpower's rates are not reflective of market prices or its actual costs.

89.    The following table represents Ms. Silva's Mpower electricity rates over 14 billing periods versus the Market Supply costs.

| Billing Period | Mpower Rate ($/kWh) | Market Supply Costs ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 05/31/2022–06/29/2022 | 0.199 | 0.088 | 2.26x | 126% |
| 06/29/2022–07/29/2022 | 0.219 | 0.103 | 2.13x | 113% |
| 7/29/2022–8/29/2022 | 0.219 | 0.113 | 1.94x | 94% |
| 8/29/2022–9/28/2022 | 0.219 | 0.097 | 2.25x | 125% |
| 9/28/2022–10/27/2022 | 0.219 | 0.069 | 3.18x | 218% |
| 10/27/2022–11/30/2022 | 0.199 | 0.068 | 2.93x | 193% |
| 11/30/2022–12/29/2022 | 0.199 | 0.123 | 1.62x | 62% |
| 12/29/2022–1/31/2023 | 0.199 | 0.054 | 3.68x | 268% |
| 1/31/2023–3/2/2023 | 0.199 | 0.061 | 3.24x | 224% |
| 3/2/2023–3/31/2023 | 0.199 | 0.044 | 4.52x | 352% |
| 3/31/2023–4/28/2023 | 0.189713 | 0.041 | 4.66x | 366% |
| 4/28/2023–5/30/2023 | 0.189 | 0.035 | 5.44x | 444% |
| 5/30/2023–6/28/2023 | 0.199 | 0.037 | 5.42x | 442% |
| 6/28/2023–7/28/2023 | 0.199 | 0.050 | 3.99x | 299% |

90.     Again, Mpower's variable rates are consistently and substantially higher than a rate based on the market supply costs, which further demonstrates that Mpower's rates are not set in accordance with its costs and that its rates are not based on market pricing.   As discussed above, any reasonable customer, including Ms. Silva, would reasonably expect that a rate "based on market pricing" would be "based on" Mpower's electricity supply costs and that the "other factors including overhead and profitability" would constitute a reasonable fixed markup added to Mpower's supply costs to incorporate Mpower's profit margin and overhead.  This understanding is reinforced by the contract sentence that "[t]he Variable Rate generally increases with weather fluctuations and extremes," as such fluctuations affect Mpower's supply costs but not its overhead or the fixed profit margin that follows from a rate that is "based on market pricing."

91.     Ms. Silva's Mpower rates were substantially higher than the Market Supply Costs during every month in the period and were ***double*** Market Supply Costs in 12 out of 14 months. On average, Mpower's rates were more than ***triple*** Market Supply Costs.   There is no reasonable reading of Mpower's contractual promise to base rates on "market pricing" and its statement that "[t]he Variable Rate generally increases with weather fluctuations and extremes," that permits Mpower to levy margins like the ones it extracted from customers.

92.     As with the comparison to ConEd's supply costs, the rates Mpower charged Ms. Silva likewise fail to fluctuate in accordance with Market Supply Costs.

93.     The story is similar for Ms. Silva's natural gas charges.  The following table represents Ms. Silva's Mpower natural gas rates over 14 billing periods versus the Market Supply costs.

| Billing Period | Mpower Rate ($/therm) | Market Supply Cost ($/therm) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 05/31/2022–06/29/2022 | 1.20 | 1.23 | N/A | N/A |
| 06/29/2022–07/29/2022 | 1.40 | 1.12 | 1.25x | 25% |
| 07/29/2022–08/29/2022 | 1.40 | 1.37 | 1.02x | 2% |
| 08/29/2022–09/28/2022 | 0.219[59] | 1.23 | N/A | N/A |
| 09/28/2022–10/27/2022 | 0.219[60] | 0.71 | N/A | N/A |
| 10/27/2022–11/30/2022 | 1.40 | 0.67 | 2.1x | 110% |
| 11/30/2022–12/29/2022 | 1.40 | 0.76 | 1.84x | 84% |
| 12/29/2022–01/31/2023 | 1.40 | 0.56 | 2.5x | 150% |
| 01/31/2023–03/02/2023 | 1.40 | 0.53 | 2.65x | 165% |
| 03/02/2023–03/31/2023 | 1.40 | 0.45 | 3.09x | 209% |
| 03/31/2023–04/28/2023 | 1.40 | 0.33 | 4.29x | 329% |
| 04/28/2023–05/30/2023 | 1.02 | 0.42 | 2.43x | 143% |
| 05/30/2023–06/28/2023 | 1.09 | 0.58 | 1.89x | 89% |
| 06/28/2023–07/28/2023 | 1.09 | 0.58 | 1.89x | 89% |

94.     Again, Mpower's charges were frequently double, or even triple, the market supply costs over this period.

---

[59] This anomalously low rate appears to be the result of an Mpower billing error, as it is the same as the rate Mpower charged for electricity during this billing period. $0.219/therm is less than ⅙ of the rate charged by Mpower in the preceding and succeeding billing periods.

[60] This anomalously low rate appears to be the result of an Mpower billing error, as it is the same as the rate Mpower charged for electricity during this billing period. $0.219/therm is less than ⅙ of the rate charged by Mpower in the preceding and succeeding billing periods.

95.     The market cost of wholesale energy is the primary component of the non-overhead costs Mpower incurs.  As explained above, the other cost factors that may affect Mpower's variable rate (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are included in the local utilities' costs as well.  These additional wholesale costs are relatively insignificant in terms of the overall costs Defendants incur to provide retail energy, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates.

96.     Therefore, Defendants' non-overhead cost factors cannot explain Defendants' egregiously high variable rates or the reason their rates are disconnected from changes in wholesale costs.  Further, Mpower's overhead costs (which are relatively minor compared to energy costs) also cannot explain the high variable rates charged.

97.     Indeed, Mpower routinely charges its customers variable rates for electricity that are among the highest offered by ESCOs in New York.  According to data from the U.S. Energy Information Administration, Mpower charged its customers the eleventh highest price of 67 ESCOs in New York in 2021, the seventeenth highest price of 65 ESCOs in New York in 2020, and the twenty-third highest price of 71 ESCOs in New York in 2019.[61]  Mpower's variable rates are also far higher than the average ESCO rate for electricity, with rates that were 37% higher than average in 2021, 20% higher than average in 2020, and 21% higher than average in 2019.[62]  These other ESCOS have costs and overhead expenses that are similar to, or greater than, those Mpower incurs.

---

[61] *See* Electric Sales, Revenue, and Average Price, U.S. ENERGY INFORMATION ADMINISTRATION, Table 12, https://www.eia.gov/electricity/sales_revenue_price/ (last visited Nov. 7, 2023).

[62] *See id.*

98.     In fact, Mpower's overhead expenses are likely to be significantly lower than its competitors' overhead expenses because Mpower is run out of a single location in Brooklyn's Midwood neighborhood.  In fact, in a separate litigation in the United States District Court for the District of New Jersey, Mpower's attorneys represented in an August 28 letter that Mpower "is a small company with very few employees."  Mpower likewise claimed in an October 18 public filing that Mpower is a "small business run by a handful of very hardworking people" and that Mpower is "a small business with a few employees and limited resources."[63]

99.     Defendants' ability to make a profit does not justify its outrageously high rates.  A reasonable customer might understand that an ESCO will attempt to make a reasonable profit by selling customers retail energy.  However, such a customer would also expect that such profits would be consistent with profit margins obtained by other suppliers of energy in their respective markets and that Mpower's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to a rate based on costs but is instead outrageously higher.

100.    In this case, Mpower knew that once it had acquired the customer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

101.    It is well-established that defaults are powerful drivers of customer behavior. There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[64] and "Nudges."[65]

---

[63] *Rhymes v. MPower Energy NJ LLC*, No. 23-cv-02556, ECF No. 52 at 4 (D.N.J. Oct. 18, 2023).

[64] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[65] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

102.    The fact that Mpower charges initial fixed rates that are substantially lower than its variable rates also proves that the costs and expenses Mpower incurs do not justify its exorbitant variable rates.  Mpower's introductory fixed rates are always substantially lower than its variable rates; after all, that is how Mpower attracts customers in the first place.  Mpower incurs the same costs, expenses, and margins to supply introductory fixed rate customers as it incurs for its variable rate customers.

103.    Mpower's exploitation of customer inertia is further exacerbated by the fact that it is unlikely that customers will compare Mpower's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.  As the NYPSC has observed, "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[66]   Indeed, this is why on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.

104.    Mpower's one-page contract also claims that it supplies "100% renewable energy."   Mpower's claim is false and Mpower breached its one-page contract when it failed to supply customers with "100% renewable energy."  Rather than producing renewable energy or procuring energy from renewable energy producers, Mpower simply purchases Renewable Energy Certificates ("RECs") that represent the production by another entity of renewable energy.  Mpower then falsely claims that it supplies "100% renewable energy."  Yet, consistent

---

[66] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 11 (Feb. 25, 2014).

with the NYPSC's findings described in paragraph 47 above, Mpower customers' meters are not actually receiving renewable "green" energy but are instead supplied with the same "brown" energy derived from fossil fuels paired with offsets for fossil fuel consumption.  Despite promising "100% renewable energy" Mpower is not actually providing customers a meaningful amount of added renewable energy compared to what the customer's existing utility provides, much less "100% renewable energy."   As the NYPSC staff made clear, "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a "green" commodity product."[67]

105.    In addition, even assuming Mpower could use RECs to fulfill its promise to provide "100% renewable energy" Defendants did not even purchase RECs equaling 100% of the energy it provided to customers whose one-page contracts contained the "100% renewable energy" promise.

106.    Further, of the limited RECs Mpower purchased, there were RECs for the wrong usage period, the wrong fuel type, and the wrong geography.   Any reasonable customer would understand that if Mpower purchased RECs to support its claim that it "offers premium 100% renewable energy," those RECs would correspond to the customer's geography, fuel type, and the time period in which Mpower's brown energy is being consumed.  In other words, if Mpower supposedly supplies "100% renewable" electricity to New York customers, the RECs it

---

[67] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 69–70 (Mar. 30, 2018).

purchases should be for (i) the same type of energy the customer uses, (ii) energy produced for consumption in New York, and (iii) energy consumed during the same time period as the customer's usage of Mpower's "brown" energy. Yet despite this, the RECs Mpower purchased included RECs for the wrong usage period, the wrong fuel type, and the wrong geography.

107. For example, on April 24, 2023, the NYPSC sent a letter to Defendants' CEO Lavie Popack entitled "Notice of Apparent Violation" ("NOAV"), notifying Mpower of its findings that the sales data Mpower had reported to the NYPSC for the period from April 16, 2021 to December 31, 2021 showed that Mpower "did not retire the number of RECs that were contractually obligated through its sales agreements to meet the 100% renewable product that was marketed to and sold to customers. . . ."[68]

108. The NYPSC's NOAV to Defendants' CEO indicates that it came on the heels of a multi-month NYPSC audit of Mpower's practices and that during the audit Mpower supplied multiple rounds of data demonstrating the falsity of its promise to supply customers with 100% renewable energy.[69] First, in July 2022, Mpower submitted its sales data to the NYPSC and on July 29, 2022 NYPSC staff found that (a) "[t]he RECs that were retired were the incorrect vintage" (b) "[a] portion of the RECs that were retired were the wrong fuel type," and (c) "[t]he RECs that were retired were not generated in New York state or properly imported into the

---

[68] Letter from Aric Rider, Deputy Director, Office of Consumer Services, N.Y. Dep't of Pub. Serv., to Lavie Popack, CEO, Mpower Energy, LLC, at 6 (Apr. 24, 2023) ("Notice of Apparent Violation (NOAV)") (hereinafter, "NOAV").

[69] *Id.* at 4–8. The NOAV centers on Mpower's compliance with the NYPSC's December 12, 2019 regulatory changes (referenced in paras. 44 to 56 *supra*.), and the NYPSC's Uniform Business Practices (referenced in para. 39 *supra*). *Id.* at 3, 4. The December 2019 regulatory changes require ESCOs that market renewable energy to make disclosures to the NYPSC regarding their renewable energy sales, which disclosures verified by NYPSC staff. *Id.* The NYPSC's Uniform Business Practices require ESCOs to adhere to the policies and procedures set forth in their contracts with the ESCOs' customers. *Id.* at 6.

State."[70]    Based on Mpower's own "self-reported" data, the NYPSC further determined that for

the period of April 16, 2021 to December 31, 2021, of 110,519 Megawatt hours for which

Mpower needed to purchase appropriate RECs, Mpower had purchased only 21 RECs and there

was thus "a shortfall of 110,498 RECs"—*a shortfall of 99.98%*.[71]    Notably, Mpower "did not

contest the findings."[72]    After Mpower was given the opportunity to make up for this massive

shortfall by making a voluntary payment of $2,628,747.42, Mpower instead submitted revised

self-reported data.[73]    On October 13, 2022, NYPSC staff met with Mpower.[74]    According to

NYPSC staff, Mpower made the spurious claim that "combining a home warranty product with a

renewable product exempted it from purchasing RECs to cover their contractual obligation."[75]

109.    Then, "[o]n October 18, 2022, in response to the questionable data presented

during this audit process" the NYPSC staff requested additional information, including the

Mpower customer usage "data for customers served on both renewable and non-renewable

products for 2021. . . ."[76]    The data Mpower produced in response indicates that "customers

received either 0% or 50% renewable product despite its offering on 100% renewable products to

its customers."[77]    "Additionally, the spreadsheet identified customers as home warranty

customers who had no REC obligations listed even though home warranty products are bundled

---

[70] *Id.* at 4.

[71] *Id.*

[72] *Id.*

[73] *Id.* at 4–5.

[74] *Id.* at 5.

[75] *Id.*

[76] *Id.* at 8.

[77] *Id.*

with renewable energy."[78]  According to the NYPSC, "[t]he spreadsheets provided by Mpower are yet another indication" that Mpower did not provide "100% renewable products."[79]

110.    Upon information and belief, Mpower's REC purchasing and related business practices practices do not vary materially from jurisdiction to jurisdiction.

## C.    Plaintiff Kirk Burke-Hamilton's Dealings With Mpower

111.    In or around September 2021, an Mpower salesperson solicited Mr. Burke-Hamilton to switch his electricity account for his home in the District of Columbia from his local utility, Pepco, to Mpower.   Upon information and belief, Mr. Burke-Hamilton received, reviewed, and signed the same or a substantially similar one-page contract as Ms. Silva.  In or around October 2021, or soon thereafter, Mpower began supplying electricity to Mr. Burke-Hamilton's residence at a fixed rate.  Upon information and belief, and consistent with the NYPSC staff's findings, the electricity Mpower supplied to Mr. Burke-Hamilton was not "100% renewable energy."

## D.    Continuing Violation and Tolling

112.    Given that Defendants have engaged in a series of deceptive acts and omissions for which they billed customers and customers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Mpower's last wrongful act against Plaintiffs.  Because Ms. Silva is a current Mpower customer, she continues to be harmed each month when Mpower assesses exorbitant charges for her energy supply.

---

[78] *Id.*

[79] *Id.*

## CLASS ACTION ALLEGATIONS

113.     Plaintiffs bring this action on their own behalf and additionally, pursuant to

Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all

Mpower customers in the United States who were charged for electricity or natural gas services

by Mpower from the earliest allowable date through the date of judgment (the "Class").

114.     As alleged throughout this Complaint, the Class claims all derive directly from a

single course of conduct by Defendants.  Defendants have engaged in uniform and standardized

conduct toward the Class—their marketing and billing practices—and this case is about the

responsibility of Defendants for their knowledge and conduct in deceiving their customers.  This

conduct did not meaningfully differentiate among individual Class Members in its degree of care

or candor, its actions or inactions, or in its omissions.  Upon information and belief, the variable

rate provisions and the promise of 100% renewable energy in the customer agreements for all of

Mpower's customers (the "Class Members") are materially the same.

115.     The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

a.   The Multistate Class, preliminarily defined as all Mpower customers in
the United States (including customers of companies Mpower acts as a
successor to) charged for electricity or natural gas by Mpower.

b.   The State Classes, preliminarily defined as all Mpower customers in the
state of [e.g., New York, etc., or Washington, D.C.] (including
customers of companies Mpower acts as a successor to) who were
charged for electricity or natural gas by Mpower.

116.     Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of

Defendants; any entity in which Defendants have or had a controlling interest, or which

Defendants otherwise control or controlled; and any officer, director, employee, legal

representative, predecessor, successor, or assignee of Defendants.

117.     Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiffs file their motion for class certification.

118.     Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Mpower.  Plaintiffs believe, however, that based on the publicly available data concerning Defendants' customers in the United States, the Class encompasses tens, or even hundreds, of thousands of individuals whose identities can be readily ascertained from Defendants' records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

119.     The Class is ascertainable because its members can be readily identified using data and information kept by Defendants in the usual course of business and within Defendants' control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

120.     Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendants' conduct.

121.     Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

122.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a.  Whether Mpower breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

b.  Whether Mpower breached its contract with Plaintiffs and Class Members by failing to provide the promised percentage of renewable energy;

c.  Whether Mpower violated the duty of good faith and fair dealing in its customer contracts;

d.  Whether Mpower's misrepresentations and omissions are materially misleading;

e.  Whether Mpower's conduct violates state consumer protection law;

f.  Whether Mpower was unjustly enriched as a result of its conduct;

g.  Whether Class Members have been injured by Mpower's conduct;

h.  Whether, and to what extent, equitable relief should be imposed on Mpower to prevent it from continuing its unlawful practices; and

i.  The extent of class-wide injury and the measure of damages for those injuries.

123.    A class action is superior to all other available methods for resolving this controversy because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct; and (iii) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

124. A class action is also appropriate because Mpower has acted or refused to act on grounds generally applicable to all Class Members.

125. Further, the following issues are also appropriately resolved on a class-wide basis under FED. R. CIV. P. 23(c)(4):

    a. Whether Mpower breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    b. Whether Mpower breached its contract with Plaintiffs and Class Members by failing to provide the promised percentage of renewable energy;

    c. Whether Mpower violated the duty of good faith and fair dealing in its customer contracts;

    d. Whether Mpower's misrepresentations and omissions are materially misleading;

    e. Whether Mpower's conduct violates state consumer protection law;

    f. Whether Mpower was unjustly enriched as a result of its conduct; and

    g. Whether Class Members have been injured by Mpower's conduct.

126. Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

**(On behalf of the Multistate Class, or alternatively,
on behalf of each of the individual State Classes)**

127. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

128. Mpower customers have customer agreements whose variable rate terms are substantially similar.

129.    Plaintiffs and the Class entered into valid contracts with Defendants for the provision of electricity and/or natural gas.

130.    Mpower uniformly represents in the pricing term of its one-page form customer contract that its variable rate for electricity and natural gas "is charged at a rate determined monthly based on market pricing and other factors including overhead and profitability, but is not tiled [sic] to any published index and does not have a cap.  The Variable Rate generally increases with weather fluctuations and extremes."

131.    Mpower uniformly represents its one-page form customer contract that "Mpower offers premium 100% renewable energy."

132.    Plaintiffs were subject to the same contractual pricing term for their variable rate for electricity and/or natural gas as Defendants' other customers in the United States.

133.    Plaintiffs were subject to the same contractual promise that "Mpower offers premium 100% renewable energy" as Defendants' other customers in the United States.

134.    Pursuant to the contracts, Plaintiffs and the Class paid the rates Defendants charged for electricity and/or natural gas.

135.    However, Mpower failed to perform its obligations under its contracts to charge variable rates based upon the costs and factors identified in the contract.  Instead, Defendants charged variable rates for electricity and natural gas that were untethered from the factors upon which the parties agreed the rate would be based.

136.    Mpower also failed to perform its obligation to supply "100% renewable energy." Specifically, Mpower did not purchase sufficient RECs to offset "100%" of the energy Defendants supplied to customers, and of the limited RECs Mpower purchased, there were RECs

that were (a) the incorrect vintage (b) the wrong fuel type and (c) not generated in the appropriate state or properly imported into that state.

137.    Plaintiff Silva and the Class were damaged as a result because they were billed, and they paid, a charge for electricity and/or natural gas that was higher than it would have been had Mpower based its rate on the costs and factors identified in the contract.

138.    Plaintiffs and the Class were also damaged as a result because they were billed, and they paid, a charge for energy that was not "100% renewable energy."

139.    By reason of the foregoing, Mpower is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees.

<u>COUNT II</u>
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(In the alternative to Count I)**
**(On behalf of the Multistate Class, or alternatively,**
**on behalf of each of the individual State Classes)**

140.    Plaintiff Silva realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.    Plaintiffs and the Class contracted with Mpower for the provision of electricity and/or natural gas supply.

142.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

143.    Under the contract, to the extent Mpower had discretion to set the variable rate for energy, it was obligated to exercise its discretion in good faith.  Mpower exercised its discretion in bad faith.  Specifically, Mpower acted with a bad motive and continued to price gouge customers.

144.    Plaintiff Silva reasonably expected that Mpower's variable energy rates would not be continuously and significantly higher than its actual costs plus a commercially reasonable margin or than the utility's rates, which otherwise provide the same energy supply as Mpower.  Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Mpower.

145.    Plaintiff Silva also reasonably expected that Mpower's variable rates would, notwithstanding Mpower's profit goals, reflect the market price for energy and that Mpower would refrain from price gouging.  Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Defendants.  Mpower knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

146.    Mpower breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiff Silva's and other Class Members' reasonable expectations that Mpower's variable energy rate would be commensurate with its costs plus a commercially reasonable margin.

147.    As a result of Mpower's breaches, Mpower is liable to Plaintiff Silva and members of the Class for damages and attorney's fees and expenses.

## <u>COUNT III</u>
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

### (On behalf of the Multistate Class)

148.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.    Plaintiffs brings this claim under N.Y. GEN. BUS. LAW § 349 on their own behalf and on behalf of each member of the Class.

150.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW § 349.

151.     Mpower's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

152.     Mpower has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW § 349, including:

    a.  Misrepresenting in its form customer contract the basis upon which its variable rates are set;

    b.  Misrepresenting in its form customer contract that its energy is 100% renewable energy when in fact Mpower failed to purchase sufficient RECs to offset 100% of customers' energy usage;

    c.  Misrepresenting in its form customer contract that its energy is 100% renewable energy when in fact Mpower purchased RECs that are of (i) the incorrect vintage, (ii) the wrong fuel type, or (iii) not generated in the appropriate state or properly imported into that state;

    d.  Failing to adequately disclose that Mpower's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    e.  Failing to provide customers adequate advance notice of the variable rates it would charge;

    f.  Failing to adequately disclose the variable rate methodology Mpower used to calculate its variable rates to enable customers to potentially compare prices; and

    g.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged.

153.     The above deceptive practices and acts by Mpower were material misrepresentations or omissions of existing or past facts.

154. Defendants knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

155. The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

156. Defendants' false, deceptive, and misleading statements and omissions would have been material to any potential customer's decision to enroll in or continue to purchase electricity from Mpower.

157. Under New York's ESCO Customer Bill of Rights, a residential customer may rescind their agreement within three days. During the rescissionary period, Mpower's contract serves as a solicitation because customers may "cancel" the agreement before it becomes legally binding upon the expiration of the rescissionary period (rendering the contract illusory during this period). Thus, the contract is an advertisement in which Mpower misrepresents that the variable energy rates will be based upon the costs and factors identified. Mpower also knew that its variable rate is not in fact based on its costs, expenses, and commercially reasonable margins.

158. Mpower knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Mpower.

159. Mpower knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Mpower was the customer's local utility.

160. Mpower knew at the time it signed up Plaintiffs and prospective customers that Mpower's variable rates for energy were consistently and substantially higher than Plaintiffs' and prospective customers' local utilities' rates. Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

161.    Mpower knew at the time it signed up Plaintiffs and prospective customers that Mpower's customers would only learn about Mpower's monthly variable rate for their consumption after they used Mpower's energy.  Mpower knew at the time it signed up Plaintiffs and prospective customers that switching from Mpower would take at least 30 days after the customer requested to switch and that during that time-period the customer was still required to pay Mpower's variable rates.  Mpower knew well in advance what variable rates it would charge and that those rates were much higher than customers' existing utilities' rates.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

162.    Mpower knew at the time it signed up Plaintiffs and prospective customers that Mpower had failed to disclose the actual methodology Mpower used to calculate its variable rates in a way that would allow a reasonable person to potentially compare prices.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

163.    Mpower knew at the time it signed up Plaintiffs and prospective customers what conditions must be present for an Mpower variable rate customer to save money compared to what the customer's local utility would have charged.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

164.    Mpower knew at the time it signed up Plaintiffs and prospective customers that offering "100% renewable energy" was a material factor in customers' decision to choose to purchase their energy supply from Mpower.

165.    Defendants' intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.  By making the misrepresentations and material omissions outlined in paragraph 152 above, Defendants deprived customers of the ability to make informed purchasing decisions.

166.    Defendants' practices are unconscionable and outside the norm of reasonable business practices.

167.    As a direct and proximate result of Defendants' unlawful deceptive acts and practices, Plaintiffs and Class Members switched to and remained with Mpower and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendants charged a rate based on the contract, as well as the difference between Mpower's variable rate and the supply rate utilities charge, which is the rate Plaintiffs and Class Members would have received had they not been deceived into accepting energy supply from Defendants.  Plaintiffs and Class Members also suffered and continue to suffer an ascertainable loss of monies based on the difference in the rates they were charged for "100% renewable energy" versus the rate its brown energy paired with its limited RECs was actually worth.  By reason of the foregoing, Mpower is liable to Plaintiffs and Class Members for compensatory damage or statutory damages (whichever is greater), attorneys' fees, and the costs of this suit.

168.    Plaintiffs and the members of the Class further seek equitable relief against Defendants.  Pursuant to N.Y. GEN. BUS. LAW § 349, this Court has the power to award such relief, including but not limited to, an order declaring Mpower's practices to be unlawful, an order enjoining Mpower from engaging in any further unlawful conduct, and an order directing Mpower to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

169.    As a result of Mpower's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, statutory damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. GEN. BUS. LAW § 349.

<u>**COUNT IV**</u>
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349-d**

**(On behalf of the Multistate Class)**

170.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

171.    N.Y. GEN. BUS. LAW §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

172.    N.Y. GEN. BUS. LAW § 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."  The marketing email Mpower sent to Plaintiff Silva violated N.Y. GEN. BUS. LAW § 349-d(7).  Specifically, the marketing email does not disclose the Mpower charges a variable rate.

173.    Mpower offers for sale energy services for and on behalf of an ESCO.

174.    Mpower further engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW §§ 349-d(3) as described above, including:

    a.    Misrepresenting in its form customer contract the basis upon which its variable rates are set;

    b.    Misrepresenting in its form customer contract that its energy is 100% renewable energy when in fact Mpower failed to purchase sufficient RECs to offset 100% of customers' energy usage;

    c.   Misrepresenting in its form customer contract that its energy is 100% renewable energy when in fact Mpower purchased RECs that are of (i) the incorrect vintage, (ii) the wrong fuel type, or (iii) not generated in the appropriate state or properly imported into that state;

    d.   Failing to adequately disclose that Mpower's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    e.   Failing to provide customers adequate advance notice of the variable rates it would charge;

    f.   Failing to adequately disclose the variable rate methodology Mpower used to calculate its variable rates to enable customers to potentially compare prices; and

    g.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged.

175.　The above deceptive practices and acts by Mpower were material misrepresentations or omissions of existing or past facts.

176.　Defendants knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

177.　The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

178.　Mpower's false, deceptive, and misleading statements and omissions would have been material to any potential customer's decision to enroll in or continue to purchase electricity from Mpower.

179.　Under New York's ESCO Customer Bill of Rights, a residential customer may rescind their agreement within three days.  During the rescissionary period, Mpower's contract serves as a solicitation because customers may "cancel" the agreement before it becomes legally binding upon the expiration of the rescissionary period (rendering the contract illusory during this period).  Thus, the contract is an advertisement in which Mpower misrepresents that the

variable energy rates will be based upon the costs and factors identified.  Mpower also knew that

its variable rate is not in fact based on its costs, expenses, and commercially reasonable margins.

180.    Mpower knew at the time it signed up Plaintiffs and prospective customers that

the price of a customer's energy supply was a material factor in choosing Mpower.

181.    Mpower knew at the time it signed up Plaintiffs and prospective customers that a

customer's primary alternative to Mpower was the customer's local utility.

182.    Mpower knew at the time it signed up Plaintiffs and prospective customers that

Mpower's variable rates for energy were consistently and substantially higher than Plaintiffs'

and prospective customers' local utilities' rates.  Mpower also knew that this information was

not readily available to its customers and knew that its customers were acting on the basis of

mistaken knowledge.

183.    Mpower knew at the time it signed up Plaintiffs and prospective customers that

Mpower's customers would only learn about Mpower's monthly variable rate for their

consumption after they used Mpower's energy.  Mpower knew at the time it signed up Plaintiffs

and prospective customers that switching from Mpower would take at least 30 days after the

customer requested to switch and that during that time-period the customer was still required to

pay Mpower's variable rates.  Mpower knew well in advance what variable rates it would charge

and that those rates were much higher than customers' existing utilities' rates.  Mpower also

knew that this information was not readily available to its customers and knew that its customers

were acting on the basis of mistaken knowledge.

184.    Mpower knew at the time it signed up Plaintiffs and prospective customers that

Mpower had failed to disclose the actual methodology Mpower used to calculate its variable

rates in a way that would allow a reasonable person to potentially compare prices.  Mpower also

knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

185.    Mpower knew at the time it signed up Plaintiffs and prospective customers what conditions must be present for an Mpower variable rate customer to save money compared to what the customer's local utility would have charged.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

186.    Mpower knew at the time it signed up Plaintiffs and prospective customers that offering "100% renewable energy" was a material factor in customers' decision to choose to purchase their energy supply from Mpower.

187.    Mpower's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.  By making the material omissions outlined in paragraph 174 above, Mpower deprived customers of the ability to make informed purchasing decisions.

188.    Mpower's practices are unconscionable and outside the norm of reasonable business practices.

189.    As a direct and proximate result of Mpower's unlawful deceptive acts and practices, Plaintiffs and Class Members switched to and remained with Mpower and suffered and continue to suffer an ascertainable loss of monies based on the difference between the rate they were charged versus the rate they would have been charged had Mpower charged a rate based the contract, as well as the difference between Mpower's variable rate and the supply rate utilities charge, which is the rate Plaintiffs and Class Members would have received had they not been deceived into accepting energy supply from Mpower.  Plaintiffs and Class Members also

suffered and continue to suffer an ascertainable loss of monies based on the difference in the rates they were charged for "100% renewable energy" versus the rate its brown energy paired with its limited RECs was actually worth. By reason of the foregoing, Mpower is liable to Plaintiffs and Class Members for compensatory damage or statutory damages (whichever is greater), attorneys' fees, and the costs of this suit.

190.    As a result of Mpower's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. GEN. BUS. LAW § 349-d.

191.    Mpower's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect energy customers.

192.    Plaintiffs further seek an Order enjoining Mpower from undertaking any further unlawful conduct, pursuant to N.Y. GEN. BUS. LAW § 349-d(10).

193.    Plaintiffs and the members of the Class further seek equitable relief against Mpower. Pursuant to N.Y. GEN. BUS. LAW § 349-d(10), this Court has the power to award such relief, including but not limited to, an order declaring Mpower's practices to be unlawful, an order enjoining Mpower from engaging in any further unlawful conduct, and an order directing Mpower to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

<u>**COUNT V**</u>
**VIOLATION OF MATERIALLY IDENTICAL STATE**
**CONSUMER PROTECTION LAWS**

**(In the alternative to Counts III and IV)**
**(On behalf of each of the individual State Classes)**

194.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

195.     Pursuant to the materially identical consumer protection statutes of New York, New Jersey, Pennsylvania, Ohio, Maryland, Washington, D.C., and Illinois, customers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

196.     Mpower violated at least the following materially identical statutes:

    a.   New York General Business Law § 349;

    b.   New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2;

    c.   Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4);

    d.   Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.02, .03;

    e.   Maryland Consumer Protection Act, Md. Commercial Law Code Ann. § 13-303, *et seq.*;

    f.   District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904, *et seq.*; and

    g.   Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2.

197.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

198.     Mpower has engaged in, and continues to engage in, deceptive acts and practices, including:

    a.   Misrepresenting in its form customer contract the basis upon which its variable rates are set;

    b.   Misrepresenting in its form customer contract that its energy is 100% renewable energy;

    c.   Failing to adequately disclose that Mpower's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    d.   Failing to provide customers adequate advance notice of the variable rates it would charge;

    e.   Failing to adequately disclose the variable rate methodology Mpower used to calculate its variable rates to enable customers to potentially compare prices; and

    f.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged.

199.    The above unfair and deceptive practices and acts by Mpower were material misrepresentations and omissions of existing or past facts.

200.    Mpower knew or believed that the above unfair and deceptive practices and acts were material omissions and affirmative false statements.

201.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

202.    Mpower first made these misrepresentations prior to the conclusion of the rescissionary period of the contract, during which Mpower's contract served as a solicitation.  The agreement is not legally binding prior to the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Mpower misrepresents that the variable energy rates will be based upon the costs and factors identified in the contract.

203.    Mpower's false, deceptive, and misleading statements and omissions would have been material to any potential customer's decision to continue to purchase electricity from Mpower.

204.    Mpower knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Mpower was the customer's local utility.  Mpower also knew that its variable rate was not based on its costs, expenses, and a commercially reasonable margin.

205.    Mpower knew at the time it signed up Plaintiffs and prospective customers that Mpower's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utilities' rates—rates based on market costs.

206.    Mpower's omission that Mpower's variable rate for energy was consistently substantially higher than the local utility rate is material to prospective customers.

207.    Mpower knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Mpower.

208.    Mpower knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Mpower was the customer's local utility.

209.    Mpower knew at the time it signed up Plaintiffs and prospective customers that Mpower's variable rates for energy were consistently and substantially higher than Plaintiffs' and prospective customers' local utility rate.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

210.    Mpower knew at the time it signed up Plaintiffs and prospective customers that Mpower's customers would only learn about Mpower's monthly variable rate for their consumption after they used Mpower's energy.  Mpower knew at the time it signed up Plaintiffs and prospective customers that switching from Mpower would take at least 30 days after the customer requested to switch and that during that time-period the customer was still required to pay Mpower's variable rates.  Mpower knew well in advance what variable rates it would charge

and that those rates were much higher than customers' existing utilities' rates.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

211.    Mpower knew at the time it signed up Plaintiffs and prospective customers that Mpower had failed to disclose the actual methodology Mpower used to calculate its variable rates in a way that would allow a reasonable person to potentially compare prices.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

212.    Mpower knew at the time it signed up Plaintiffs and prospective customers what conditions must be present for an Mpower variable rate customer to save money compared to what the customer's local utility would have charged.  Mpower also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

213.    Mpower knew at the time it signed up Plaintiffs and prospective customers that offering "100% renewable energy" was a material factor in customers' decision to choose to purchase their energy supply from Mpower.

214.    Mpower's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.  By making the material omissions outlined in paragraph 198 above, Mpower deprives customers of the ability to make informed purchasing decisions.

215.    Mpower's practices are unconscionable and outside the norm of reasonable business practices.

216.    As a direct and proximate result of Mpower's unlawful deceptive acts and practices, Plaintiffs and Class Members switched to and remained with Mpower and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Mpower charged a rate based on its costs, as well as the difference between Mpower's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Mpower.  Plaintiffs and Class Members also suffered and continue to suffer an ascertainable loss of monies based on the difference in the rates they were charged for "100% renewable energy" versus the rate its brown energy paired with its limited RECs was actually worth.  By reason of the foregoing, Mpower is liable to Plaintiffs and Class Members for all compensatory damages, statutory damages, attorneys' fees, and the costs of this suit available under applicable law.

217.    Plaintiffs and the members of the Class further seek equitable relief against Mpower.  This Court has the power to award such relief, including but not limited to, an order declaring Mpower's practices to be unlawful, an order enjoining Mpower from engaging in any further unlawful conduct, and an order directing Mpower to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

218.    As a result of Defendant's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under each state's respective consumer protection statute.

## COUNT VI
## UNJUST ENRICHMENT

**(In the alternative to Contract Claims)**
**(On behalf of the Multistate Class, or alternatively,**
**on behalf of each of the individual State Classes)**

219.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

220.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs do not intend to proceed with their unjust enrichment claim.

221.    Plaintiffs and the Class Members conferred a tangible economic benefit upon Mpower by contracting with Mpower for energy.  Plaintiffs and the Class would not have contracted with Mpower for energy had they known that Mpower would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

222.    Plaintiffs and the Class Members would not have purchased energy from Mpower had they known the truth about Mpower's variable energy rates or about its REC purchasing practices.

223.    By engaging in the conduct described above, Mpower has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

224.    It would be unjust and inequitable for Mpower to retain the payments Plaintiffs and Class Members made for excessive energy charges.

225.    Therefore, Defendants are liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Mpower's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Classes defined above, appointing Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Mpower has committed the violations of law alleged herein;

(c)    Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(e)    Render an award of punitive damages;

(f)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)    Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.

## NOTICE TO ATTORNEY GENERAL AND OTHER GOVERNMENT OFFICIALS

A copy of this Complaint will be electronically mailed to the Attorney General of the State of New Jersey within twenty-four hours of its filing, pursuant to N.J.S.A. § 56:8-20.

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois pursuant to 815 I.L.C.S § 505/10a(d).

Dated: November 7, 2023
New York, New York

**WITTELS MCINTURFF PALIKOVIC**

By:    *J. Burkett McInturff*
        J. Burkett McInturff
        Jessica L. Hunter
        Nathan A. Rice*
        305 Broadway, 7th Floor
        New York, New York 10007
        Telephone: (914) 775-8862
        jbm@wittelslaw.com
        jlh@wittelslaw.com
        nar@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**

D. Greg Blankinship
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

**KHEYFITS BELENKY LLP**

Andrey Belenky
80 Broad Street, 5th Floor
New York, New York 10004
Telephone: (212) 203-5399
abelenky@kblit.com

*Attorneys for Plaintiffs and the Proposed Class*

*\*Pro Hac Vice application forthcoming*