UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAGDA SILVA and KIRK BURKE-HAMILTON, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>-against-<br>MPOWER ENERGY, LLC and MPOWER ENERGY NJ LLC,<br>Defendants. | 23-CV-9849 (JGLC) |
| AYAN RHYMES and LOVELEEN KAUR, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>-against-<br>MPOWER ENERGY NJ LLC,<br>Defendant. | 24-CV-2015 (JGLC) |

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Two sets of plaintiffs filed separate putative class actions alleging that a power supplier artificially inflated tens of thousands of customers' gas and electricity bills, in violation of their contracts. On March 27, 2025, Magistrate Judge Ona W. Wang—to whom the cases are referred—issued an Opinion and Order granting Defendants' motion to compel arbitration. In her Opinion, Judge Wang determined that the contract signed by each plaintiff included an agreement to arbitrate their claims. Before the Court now are Plaintiffs' objections to the Opinion. For the reasons stated herein, Plaintiffs' objections are unavailing and thus DENIED.

## BACKGROUND

This motion involves a dispute over whether the parties created a valid and enforceable contract to arbitrate their disputes.[1] The Court assumes familiarity with the dispute as outlined in Judge Wang's Opinion and Order (the "Opinion") and only briefly reviews the relevant background. *See generally* ECF No. 103 ("Opinion"). Three of the four named plaintiffs in these actions—Ayan Rhymes, Magda Silva, and Kirk Burke-Hamilton (collectively, the "Contract Plaintiffs")—signed agreements with MPower Energy, LLC and/or MPower Energy NJ LLC ("MPower" or "Defendants") to provide electricity and gas services to their homes. *See* ECF No. 98-6. These enrollment interactions occurred with door-to-door sales agents ("Sales Representatives") who approached the Contract Plaintiffs near their homes. ECF 92-7 ("Silva Dep.") at 21:7–23:23; ECF No. 92-8 ("Rhymes Dep.") at 25:24–27:3; ECF No. 92-9 ("Hamilton Dep.") at 14:10–15:10. During the enrollment interactions, the Sales Representatives generally input the Contract Plaintiffs' personal information into iPads, gave the iPads to the Contract Plaintiffs to review and scroll through the Terms and Conditions, and then directed the Contract Plaintiffs to initial or sign. Silva Dep. at 23:6–8; Rhymes Dep. at 30:15–31:3; Hamilton Dep. at 19:17–20:10; ECF No. 92-10 ("Watson Dep.") at 49:6–52:2; ECF No. 92-11 ("Galeas Dep.") at 46:20–48:19, 72:8–11. The Sales Representatives' undisputed testimony is that "the mechanism on the platform . . . would make [them] scroll all the way through the contract," including "all the pages," before they arrived at the signature page. Galeas Dep. at 74:18–21; *see also id.* at 74:22–75:22; Watson Dep. at 49:15–19, 50:19–51:4. It was thus "guaranteed" that the plaintiffs would have seen—or at least scrolled through—the one-page Terms and Conditions.

[1] Unless otherwise noted, the Court follows Judge Wang's convention in the Opinion and Order and cites to the docket of *Rhymes et al v. MPower Energy NJ, LLC*, 24-CV-2015 (JGLC) (OTW) (the "Rhymes Action").

Galeas Dep. at 46:20–47:20, 57:19–22. The Terms and Conditions require the parties to resolve any disputes through arbitration. *See* ECF No. 92-1 at 4; ECF No. 92-2 at 6; ECF No. 92-3 at 4. After the enrollment was completed, Defendants attest, the enrollment software automatically sent Plaintiffs an email or text message with the contract. ECF 93 ¶¶ 11–31; ECF 94. Each Contract Plaintiff's individual enrollment experience is described below.

## I. The Enrollments

Magda Silva: Silva enrolled for MPower with a Sales Representative on April 26, 2019. Silva Dep. at 20:23–21:6. After a sales pitch, the MPower Sales Representative showed her an iPad screen, which she was asked to sign. *Id.* at 25:8–17. Silva did not know what was on the screen, beyond "[w]ords," because she did not read it. *Id.* at 25:19–23. Rather, the sales agent guided Silva through where to sign, and because "[i]t was late in the evening" and Silva "trusted what [the sales agent] told [her]," she signed the screen in front of her. *Id.* at 25:24–26:8. That same day, Silva received an email from MPower attaching a signed one-page form (with price, length of agreement, rescission, savings, and late payment fees) and a single Terms and Conditions page containing the arbitration provision. *See* ECF No. 92-2; Silva Dep. at 38:22–39:17; ECF No. 93 ¶ 15. Silva did not read either document after she received them via email. Silva Dep. at 30:17–31:14, 34:6–12, 38:22–39:25.

Ayan Rhymes: Rhymes enrolled for MPower on or around April 26, 2021. *See* Rhymes Dep. at 25:24–26:7; ECF No. 94 ¶¶ 3–8; ECF No. 92-1. On or around that day, a Sales Representative came to Rhymes's door and pitched MPower's services. Rhymes Dep. at 26:18–28:16. The Sales Representative showed Rhymes various screens on an iPad during their discussion, which Rhymes did not read. *Id.* at 32:21–33:12. Rhymes also provided various pieces of personal information, which the Sales Representative input on the iPad. *Id.* at 31:11–33:24. He

signed a screen that he believed was a verification that the information he had provided was correct. *Id.* at 35:13–36:3. Rhymes ultimately does not remember whether he enrolled in the service that day, but he knew that MPower would contact him after. *Id.* at 31:11–19, 36:19–37:3, 43:10–13. Although the MPower agreement applied to Rhymes's household, his wife, Loveleen Kaur—the fourth named plaintiff in this action—was not present for any of the interaction between Rhymes and the Sales Representative. *Id.* at 30:6–10.

Although Rhymes did not remember receiving any document from MPower after enrolling, Rhymes Dep. at 43:10–17, MPower's records and Rhymes's own records show that he did. In discovery, Rhymes produced a photograph of a text message dated April 26, 2021. ECF No. 92-12. It stated, "[w]elcome to the Mpower family!" and provided a "[l]ink to [Rhymes's] agreement document" with an access password. *Id.*; *see also* ECF No. 93 ¶¶ 19–20 (reflecting the same text in MPower's IT records). At the time of Judge Wang's Opinion, the hyperlink was still active and contained the document filed with the Court at ECF No. 92-1. *See* Opinion at 8. The link thus contained a signed one-page form (with information about contract length, pricing, and cancellation, and a stipulation permitting MPower to contact Rhymes's existing utility company), a single Terms and Conditions page containing the arbitration provision, and a one-page summary of the contract (omitting any mention of arbitration). *See* ECF No. 92-1. A forensic analysis commissioned by Defendants supports that the version of Rhymes's contract on MPower's server is eight pages (i.e., the same length as ECF No. 92-1) and that it has not been modified since it was created in 2021. ECF No. 94 ¶¶ 3–8; ECF No. 94-3. MPower's IT staff affirms that the contract was sent to Rhymes, *see* ECF No. 93 ¶ 12, and that, based on a unique password given only to Rhymes, he accessed the contract three times in short succession on April

26, 2021, and twice in short succession on April 28, 2021. *See* ECF No. 93 ¶¶ 1, 23–25; ECF No. 93-3.

Kirk Burke-Hamilton: Hamilton enrolled with MPower on or around September 29, 2021. *See* ECF No. 94 ¶¶ 14–15; ECF No. 92-3. He remembers little about his interaction with the Sales Representative. He does not remember whether the Sales Representative had papers or an iPad with him; whether the Sales Representative asked him to enroll with MPower; whether he signed anything upon meeting with the Sales Representative; or whether he provided any personal information to the Sales Representative. Hamilton Dep. at 15:23–18:4, 23:18–26:9. Initially, during his deposition, Hamilton denied being shown any written materials about the MPower agreement, both during the interaction with the Sales Representative and after—including any written contract sent by email. *Id.* at 20:25–21:8, 23:18–24:24. He did allege in the Complaint, however, that he signed a one-page contract with MPower, but not the Terms and Conditions page. *See* Complaint, *Silva v. MPower Energy, LLC*, 23-CV-9849 (JGLC) (OTW) ("Silva Action"), ECF No. 1 ¶¶ 62, 129–30. At his deposition, Hamilton testified that "based on [his] legal background," it is "generally [his] practice to review legal documents that [he] get[s] to ensure that [he] understand[s] [them] . . ." Hamilton Dep. at 24:15-24. And as such, he initially maintained that he had never seen the MPower agreement, including the arbitration provision, before the date of his deposition. *Id.* at 23:18–24:17.

After further questioning by counsel, however, Hamilton changed his testimony. Defendants confronted Hamilton with a contract containing his phone number, email address, and signature. *Id.* at 24:25–25:15; *see also* ECF No. 92-3. The contract included a signed one-page form (with supplier information, price, length of agreement, cancellation fees, renewal terms, and rate for the next billing period), a contract summary (omitting any mention of

arbitration), a single Terms and Conditions page containing the arbitration provision, and a notice of cancellation. ECF No. 92-3. When confronted with this evidence at his deposition, Hamilton stated: "I don't recall any of this, this happened a long time ago so I do not remember." Hamilton Dep. at 31:18–20; *see also id.* at 29:12–24 ("Like I said . . . I don't remember any of this."). He went on to confirm that he does not know what contract he signed—in particular, whether the contract he signed was simply the one-page contract alleged in the Complaint or the full contract presented by Defendants. Hamilton Dep. at 29:25–30:23.

Defendants' forensic analysis also reveals that an eleven-page contract was created on September 29, 2021, and has not been modified since; but neither MPower nor Hamilton have documentary evidence that an email containing the contract was sent to Hamilton after his interaction with the sales representative.[2] ECF No. 94 ¶¶ 14–15; ECF No. 93 ¶ 30; *see also* Hamilton Dep. at 21:18–23:10. MPower's IT staff attests that the third-party software at the time automatically sent an electronic copy of the executed contract to the customer. ECF No. 93 ¶ 27.

## II. Procedural History

The Court referred both cases to Judge Wang to address non-dispositive pretrial motions. Order of Reference, Rhymes Action, ECF No. 86; Order of Reference, Silva Action, ECF No. 11. The parties agreed to omnibus briefing in both cases.

Judge Wang's Opinion determined that the parties agreed to submit any disputes arising from MPower's services to arbitration and thus were compelled to arbitrate the disputes

[2] MPower began using a different software, SalesRabbit, between when Hamilton and the other plaintiffs enrolled. *See* ECF 93 ¶¶ 4–7, 26. Unlike the previous software, iKnock, SalesRabbit did not automatically upload customer contracts onto MPower's in-house server or send the contracts from an account that MPower could access. *Id.* ¶¶ 14, 17, 27. Instead, according to Defendant's IT staff, SalesRabbit "automatically sen[t] customers their executed contracts upon completion" and sent the same executed contracts in bulk to MPower. *Id.* ¶¶ 26–29.

underlying these cases. Opinion at 2, 12. Plaintiffs argued that, at most, the Contract Plaintiffs were only shown the one-page form that they signed (the "Signature Page") during the enrollment process, and thus the additional pages containing the arbitration clause were not part of the contract. *See id.* at 11 (citing ECF No. 97 at 6–8). According to Judge Wang, the undisputed nature of Plaintiffs' signatures on the contracts—that is, the Signature Page together with the arbitration clause and other documents—established Defendants' *prima facie* case that the parties executed an agreement to arbitrate. *Id.* at 12. Judge Wang found that the contracts included the Signature Page, a one-page list of Terms and Conditions, and a Spanish-language copy of both documents. *Id.* at 4 (citations omitted). Plaintiffs then failed to counter this showing to substantiate their denial that an agreement to arbitrate had been made, because the Contract Plaintiffs were on inquiry notice of the Terms and Conditions containing the arbitration provision—that is, a reasonable person in their position would understand that they were agreeing to a continuing relationship that would include some terms and conditions. *Id.* at 13–14. Because Kaur sues as a third-party beneficiary of the contract that her husband executed, the arbitration determination applied to her, too. *See id.* at 4, 14 n.10. Per the terms of the arbitration clause, Judge Wang also required Plaintiffs to arbitrate their claims individually. *Id.* at 14–15; *see also* ECF Nos. 92-1 at 4; ECF No. 92-2 at 6; 92-3 at 4.

Plaintiffs timely filed their objections on April 25, 2025, which Defendants opposed on May 29, 2025. ECF Nos. 108, 112. Plaintiffs have since alerted the Court twice to intervening supplemental authorities. *See* ECF Nos. 113, 115.

**LEGAL STANDARD**

Federal law "provides that 'a judge may designate a magistrate to hear and determine any pretrial matter pending before the court . . . .'" *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d

522, 525 (2d Cir. 1990) (quoting 28 U.S.C. § 636(b)(1)(A)). The district court reviews "nondispositive pretrial matters" under the "clearly erroneous or contrary to the law" standard. *Id.* (citing § 636(b)(1)(A); Fed. R. Civ. P. 72(a)). Courts in this District consider motions to compel arbitration to be nondispositive. *See Kumaran v. Vision Fin. Markets, LLC*, No. 20-CV-3871 (GHW), 2022 WL 17540669, at *2 (S.D.N.Y. Dec. 6, 2022) (citing *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020), *objections overruled*, No. 10-CV-6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021)) "A magistrate's ruling is contrary to law if it fails to apply or misapplies relevant statutes, case law, or rules of procedure . . . ." *Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 924 F. Supp. 2d 508, 512 (S.D.N.Y. 2013) (cleaned up). Meanwhile, "[c]lear error is present when, 'upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed.'" *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 70 (S.D.N.Y. 2019) (quoting *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006)) (second alteration in original). This "highly deferential standard" affords magistrate judges "broad discretion in resolving nondispositive disputes," and "[t]he party seeking to overturn a magistrate judge's decision thus carries a heavy burden." *Thai Lao Lignite*, 924 F. Supp. 2d at 511–12 (citations omitted).

Courts assess motions to compel arbitration with a similar standard to motions for summary judgment. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). Courts thus "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Lojewski v. Grp. Solar USA, LLC*, No. 22-CV-10816 (PAE), 2023 WL 5301423, at *7 (S.D.N.Y. Aug. 17, 2023) (quoting

*Nicosia*, 834 F.3d at 229). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted). "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue"—that is, if "there is a disputed question of material fact"—"the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022).

## DISCUSSION

Plaintiffs identify three objections to the Opinion. First, Plaintiffs contend that Defendants failed to prove as a matter of law that the Terms and Conditions—which contained the arbitration clause—were available to Plaintiffs when they signed the contract. ECF No. 108 ("Objections") at 6. Second, Plaintiffs contend that the Opinion failed to assess whether the arbitration clause was clear and conspicuous, and that the in-person context of the contract closure does not obviate the need for such an analysis. *Id.* at 21. Last, Plaintiffs argue that, to the extent they were not provided initially at the time of signing, the Terms and Conditions delivered electronically after signing do not constitute the contract. *Id.* at 24.

The commonality among the objections is Plaintiffs' contention that they were not on inquiry notice of the Terms and Conditions such that they actually "agreed to arbitrate." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022). As Defendants observe, Plaintiffs do not object to—and, in fact, appear to adopt—the Opinion's characterization of the relevant burden-shifting framework. Accordingly, the Court repeats it below:

> The party moving to compel arbitration bears the initial burden of demonstrating, by a preponderance of the credible evidence, that an

> agreement to arbitrate was made. [*Barrows v. Brinker*, 36 F.4th 45, 50 (2d Cir. 2022) (citation omitted)]; *Manukian v. Pritchard Indus.*, 22-CV-10724 (JLR) (OTW), 2023 WL 6311287, at *3 (S.D.N.Y. 2023) (citing cases). A "preponderance of the evidence" means "evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not." *Bernardino v. Barnes & Noble Booksellers, Inc.*, 17-CV-4570 (LAK) (KHP), 2017 WL 7309893, at *2 (S.D.N.Y. 2017) (citing *In re Omeprazole Patent Litig.*, 490 F.Supp 2d 381, 414 (S.D.N.Y. 2007)), *rep. & rec. adopted at*, 17-CV-4570 (LAK), 2018 WL 671258 (S.D.N.Y. 2018), *aff'd*, 763 F. App'x 101 (2d Cir. 2019). If the movant makes this showing, the burden shifts to the nonmovant to show that either: (1) they did not consent to arbitration; (2) the arbitration agreement is invalid or unenforceable; or (3) the arbitration agreement does not encompass the claims the movant wishes to arbitrate. *Manukian*, 2023 WL 6311287, at *3 (citing cases). If the movant satisfies their burden, the opposing party must "counter with at least *some evidence* to substantiate [their] denial that an agreement had been made." *Barrows*, 36 F.4th at 50. (emphasis in original) (internal citation omitted).

Opinion at 11; *see also* ECF No. 112 ("Opp.") at 7, 14 ("Plaintiffs do not object to the actual legal standards the Magistrate Judge applied . . . .").

The Court reviews the Opinion's determinations in context of the burden-shifting framework. First, the Opinion did not err in finding that Defendants satisfied their *prima facie* burden as to the existence of an agreement to arbitrate, because there is no material dispute of fact over whether Plaintiffs were on inquiry notice of the arbitration clause. And second, the Opinion did not err in finding that Plaintiffs failed to proffer evidence that creates a material dispute of fact over the validity of the contract creation or its enforceability. Instead of unequivocally disputing the contract's formation, Plaintiffs uniformly testified that they do not remember what occurred or what they signed.

## I. The Opinion Did Not Err in Finding that Defendants Satisfied Their Initial Burden to Demonstrate that an Agreement to Arbitrate Was Made

The Court rejects Plaintiffs' contention that the Opinion committed clear error in finding that Defendants met their burden to demonstrate that an agreement to arbitrate was made.

Satisfying this initial burden requires showing that Plaintiffs had actual or constructive notice of the arbitration provision. *See Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24–25 (2d Cir. 2010) (summary order) (citations omitted).

"Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Segui v. Solar Mosaic, LLC*, 802 F. Supp. 3d 545, 563 (S.D.N.Y. 2025) (quoting *Lojewski*, 2023 WL 5301423, at *9). "In determining whether an offeree has inquiry notice of a contract's terms, New York courts evaluate 'whether the term was obvious and whether it was called to the offeree's attention'—an analysis that 'often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way.'" *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116 (2d Cir. 2025) (quoting *Starke v. SquareTrade Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)). These principles apply to both analog and digital contracts. *See id.* ("The same principles apply to online contracts . . . ."). Because the evidence does not establish that Plaintiffs had actual notice of the arbitration agreement, the Opinion appropriately examined whether Plaintiffs were on inquiry notice of the arbitration provision. *See* Silva Dep. at 25:12–26:17 (explaining that Silva "did not read" the contract); Rhymes Dep. at 33:7–12 (same for Rhymes); Hamilton Dep. at 20:25–21:8, 23:18–24:17 (denying seeing any written contract).

The Court considers and rejects Plaintiffs' objections in this context. First, there is no clear error in the determination that any reasonable juror would find that the Terms and Conditions were shown to Plaintiffs when they signed their contracts. Second, the Opinion's decision not to analyze whether the arbitration provision was clear and conspicuous is not clear

error because such an analysis was implied in the Opinion and, in any event, does not change the outcome.

### A. The Opinion Did Not Clearly Err in Finding that Defendants Demonstrated the Terms and Conditions Were Available Upon Signing

Here, Plaintiffs do not dispute the veracity of their signatures and agree that a valid contract was made. *See* Silva Dep. at 36:3–16 (identifying signature); Rhymes Dep. at 99:8–11 (same); Hamilton Dep. at 25:11–15 (same); ECF No. 1-1 ¶ 94 (alleging a valid contract); Complaint, Silva Action, ECF No. 1 ¶ 129 (same); *see also generally* Opp. They also do not dispute that a signature on an arbitration agreement generally satisfies Defendants' *prima facie* burden. *See Barrows*, 36 F.4th at 50. Instead, Plaintiffs argue, the documentary evidence shows that the contract presented to Plaintiffs when they signed was only the Signature Page and thus omitted the arbitration clause. Objections at 9. Despite some variation in the Signature Pages, the arbitration provision appears only in the Terms and Conditions for all of Plaintiffs' contracts. ECF Nos. 92-1 to 92-3; Opinion at 5. Because the Sales Representatives' undisputed testimony reveals that they had to scroll through the Terms and Conditions to reach the Signature Page and that they provided time for enrollees to do that, Plaintiffs' argument is unavailing. *See* Galeas Dep. at 46:20–47:20; Watson Dep. at 49:15–19, 50:19–51:4.

Plaintiffs enrolled with MPower through a "hybrid analog–digital" process wherein Plaintiffs signed an iPad in the presence of an MPower Sales Representative. *Lojewski*, 2023 WL 5301423, at *8; Opinion at 5. As Judge Wang found, the Sales Representatives testified that the software required them to scroll through everything, including the Terms and Conditions, before customers like Plaintiffs could sign the agreement. Opinion at 6 (citing Watson Dep. at 53:11–54:7; Galeas Dep. at 46:20–48:19). One Sales Representative explained that "the mechanism on the platform . . . would make us scroll all the way through the contract," including "all the

pages." Galeas Dep. at 74:18–21; *see also id.* at 74:22–75:22. The other Sales Representative, who had worked with "thousands" of customers, described this as scrolling through "everything"—a clear reference to more than one page. Watson Dep. at 49:15–19, 52:4–8. The Sales Representatives also testified that it was their practice to allow customers to scroll on the iPad directly. *See* Watson Dep. at 25:11–14, 49:6–11; Galeas Dep. at 47:11–25. The Sales Representatives spoke consistently and repeatedly about this practice at their depositions. *See, e.g.*, Galeas Dep. at 46:24–47:4; Watson Dep. at 26:16–25. Indeed, when asked whether Plaintiff Hamilton would likely have seen the Terms and Conditions as part of the enrollment process, a Sales Representative answered: "Guaranteed. Yes." Galeas Dep. at 57:19–22. Plaintiffs present no evidence or testimony that creates a material dispute of fact on this issue.

Plaintiffs' argument that the contract only comprised the Signature Page is thus unavailing in light of the signed contracts and clear and unambiguous testimony of the Sales Representatives. *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (explaining that, under New York law, a person "who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them" (quoting *Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)). That "each Plaintiff's signature appears at the top of the One-Page Contract" does not bear on the electronic process that the Sales Representatives followed, which required customers to scroll through the Terms and Conditions before they reached the Signature Page. *See* Objections at 9; Watson Dep. 50:2–6; Galeas Dep. 46:24–47:4. Contrary to Plaintiffs' argument, the testimony of MPower's IT staff that Terms and Conditions were in a separate PDF from the Signature Page is consistent with at least one Sales Representative's account of the electronic interface. *See* Objections at 11–12; Watson Dep. 50:2–6 (describing the Signature Page as a different "part" from the Terms and Conditions). Finally, Plaintiffs note that

MPower's training materials only instruct Sales Representatives to fill out a customer's enrollment information and get their signature. Objections at 12. This fact, too, does not provide a basis for a reasonable juror to discard the clear testimony of the two Sales Representatives, who both spoke specifically about the technical requirements and the personal care they put on allowing customers to go through the terms. Accordingly, Defendants put forward a *prima facie* case that the Terms and Conditions were presented to Plaintiffs when they signed the agreement.

**B. The Opinion Did Not Clearly Err in Finding that Plaintiffs Were on Inquiry Notice of the Arbitration Agreement**

Nonetheless, Plaintiffs argue that the Opinion did not appropriately apply the relevant law regarding inquiry notice, which, they argue, requires (1) courts to consider whether the arbitral clause was obvious and called to Plaintiff's attention and (2) Defendants to submit documentary evidence to support this analysis. Objections at 6–8, 21–22. The Court finds that the ultimate conclusion that Plaintiffs were on inquiry notice of the Arbitration Agreement was not clearly erroneous.

To find that the Plaintiffs were on inquiry notice of the arbitration clause, the Court must indeed find that it was "clear and conspicuous." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116 (2d Cir. 2025). The hybrid analog–digital format of this contract, aided by a representative, does not change this classic principle of inquiry notice. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (collecting cases applying the principle to analog and digital environments); 22 N.Y. Jur. 2d Contracts § 29 ("[A] party should not be bound by clauses printed on the reverse side of a contract unless it is established that they were properly called to his or her attention and that he or she assented to them."). In analyzing whether an arbitration agreement is "reasonably conspicuous," courts look to how the terms of service—here, the Terms and Conditions—are presented as a whole and how the relevant provision is presented in that context. *See, e.g.*, *Meyer*

*v. Uber Techs., Inc.*, 868 F.3d 66, 76, 78 (2d Cir. 2017) (analyzing, under California state law, whether "notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law" by analyzing the location of, contrast with, and clutter surrounding the "terms of service" hyperlink on the screen); *Davitashvili*, 131 F.4th at 116–17 (2d Cir. 2025) (applying the *Meyer* factors to a contract under New York law).

It is thus appropriate to consider whether the Terms and Conditions were clear and conspicuous, in context of the enrollment interaction, and the undisputed facts demonstrate that they were. Because MPower's software required users to scroll past the Terms and Conditions to sign the agreement, Plaintiffs were on notice of their existence. Such "scrollwrap" agreements—that is, "agreements that a user must view because of the nature of the website's construction and design"—are typically upheld by district courts. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 398 (E.D.N.Y. 2015); *see also, e.g.*, *Bar-Ayal v. Time Warner Cable Inc.*, No. 3-CV-9905 (KMW), 2006 WL 2990032, at *9–10 (S.D.N.Y. Oct. 16, 2006) (finding acceptance when scrolling though thirty-eight screens of text was required). Defendants' Sales Representatives did not call particular attention to the arbitration provision, but they were not required to. Here, the record supports that contracts were no more than eleven pages and included, in the text of the contract itself, the arbitration provision. ECF Nos. 92-1 to 92-3. In what was sent to customers afterward, the arbitration provision "was written in clear and unequivocal language" and "was the same size print as the rest of the agreement." *Bar-Ayal*, 2006 WL 2990032, at *11; ECF Nos. 92-1 to 92-3. The arbitration provision appears on the single Terms and Conditions page as one of only sixteen terms. *See, e.g.*, ECF No. 92-1 at 4. Plaintiffs have not presented any evidence to suggest that the arbitration clause appeared differently on the iPad screen when Plaintiffs signed. It is thus clear that a "reasonable person 'would understand' that her signature on the iPad 'constitute[s] assent'

to those terms and conditions, even if she did not read the terms." *Lojewski*, 2023 WL 5301423, at *9 (quoting *Starke*, 913 F.3d at 289).

This case is distinguishable from similar hybrid digital–analog cases in this District that found inquiry notice was insufficient. *See, e.g.*, *Segui*, 802 F. Supp. 3d; *Segui v. Solar Mosaic, LLC*, No. 24-CV-968 (ER), 2026 WL 1724022 (S.D.N.Y. June 15, 2026). In those cases, unlike the instant case, there was a material dispute of fact over whether the plaintiff "was even put on notice as to the *existence* of terms and conditions" and whether the plaintiffs had, in fact, signed the document themselves. *Segui*, 802 F. Supp. 3d at 563; *Segui*, 2026 WL 1724022, at *6; *cf. Lojewski*, 2023 WL 5301423, at *7, *10–11 (noting, among other things, that the plaintiff "willingly signed once within a rectangular box, signifying her assent, and did not read the balance of the contract documents").

Additionally, contrary to Plaintiff's claim, Defendants were not required to present some type of "visual aid or description" so that the Court could assess whether the terms were clear and conspicuous. *See* Objections at 7 (quoting *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 103 (2d Cir. 2022)). In *Zachman*, the arbitration clause was not one of the initial terms that the plaintiff agreed to when she opened her account. *See Zachman v. Hudson Valley Fed. Credit Union*, No. 20-CV-1579 (VB), 2021 WL 1092508, at *1 (S.D.N.Y. Mar. 22, 2021), *vacated and remanded*, 49 F.4th 95 (2d Cir. 2022). Rather, an amended agreement containing the arbitration clause was incorporated by reference in a later agreement the plaintiff had to click through and agree to before using a new online platform. *Id.* at *2. The instant case possesses two key differences with *Zachman*. There, the relevant agreement containing the arbitration clause was incorporated by reference—i.e., not required viewing—and had changed since the plaintiff last interacted with the agreement, and thus the parties disputed whether the hyperlink

was conspicuous and put the plaintiff on notice that an arbitration term even existed. *See id.* at *1–2. And second, the Second Circuit found that the defendant "did not submit evidence of how the Internet Banking Agreement was presented to users." *Zachman*, 49 F.4th at 103. Here, on the other hand, the Sales Representatives' depositions discuss the presentation of the contract and include undisputed testimony that the Terms and Conditions were shown to Plaintiffs on the screen before they signed the agreement. *See* Galeas Dep. at 46:20–47:20; Watson Dep. at 49:15–19; *Zachman*, 2021 WL 1092508, at *7.[3]

## II. The Opinion Did Not Err in Finding that Plaintiffs Did Not Meet Their Burden to Show an Unequivocal Denial with Supporting Evidence

Because Defendants made out a *prima facie* claim that an agreement to arbitrate was made, Plaintiffs bore the burden to "prov[e] [their] defense" that the arbitration agreement is invalid. *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342 (S.D.N.Y. 2014), *aff'd*, 633 F. App'x 544 (2d Cir. 2015) (citing *Kulig v. Midland Funding, LLC*, No. 13-CV-4715 (PKC), 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13, 2013)). Plaintiffs thus needed to "make an unequivocal denial" of the agreement and "substantiate it with some evidence." *Barrows*, 36 F.4th at 50 (citing *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462

---

[3] Because Plaintiffs' in-person signing put them on inquiry notice of the arbitration agreement, Plaintiffs' objections about the later-delivered electronic contracts are moot. *See* Objections at 24–25. However, the Court agrees with Plaintiffs that later-sent contract terms would not suffice, on their own, to establish inquiry notice here. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 125–26 (2d Cir. 2012) ("Unilateral modification terms . . . are not necessarily effective."); *id.* at 124–25 (explaining that the enumerated inquiry notice standard is only appropriate where there is a lengthy course of dealing, clear assent to the terms, or unavoidable interaction with the late-delivered terms, such that the purchaser "cannot begin using the product until after he or she has been presented with the terms").

Because the undisputed facts show that Plaintiffs were shown a copy of the arbitration agreement during their enrollment, however, the later-sent contract terms here support that Plaintiffs were on inquiry notice of the arbitration agreement. That is, the electronic delivery gave Plaintiffs an additional opportunity, if they chose, to review the terms and opt out.

F.2d 673, 676 (2d Cir. 1972)). The Opinion did not err in finding that the undisputed facts show that Plaintiffs did not meet this burden.

Judge Wang found that Plaintiffs Silva and Rhymes "both *admit* that documents were presented to them on the tablets." Opinion at 14; *see also id.* at 7–8 (citing Silva Dep. at 25:12–23; Rhymes Dep. at 30:15–36:3) (emphasis in original). They nonetheless did not read the documentation to ascertain the actual terms before signing. Silva Dep. at 25:12–26:17; Rhymes Dep. at 33:7–12. After their enrollment, Silva admitted receiving an email with her contract attached, and Rhymes received a text message on the same day he signed the contract with a hyperlink to the "agreement document," which included the Terms and Conditions. *See* Silva Dep. at 38:22–39:17; ECF No. 92-12. Thus, neither plaintiff comes close to unequivocally denying that they were on notice of the arbitration agreement; indeed, their testimony and the evidence show that they clearly were. *Cf. Segui*, 802 F. Supp. 3d at 564 (finding a genuine issue of material fact where the plaintiff testified that the tablet "was completely blank" when she signed it, with no other text visible).

Plaintiff Hamilton, on the other hand, at least initially in his deposition denied ever seeing the agreement. *See* Hamilton Dep. at 20:25–21:8, 23:18–24:24. Plaintiffs thus argue that his sworn deposition testimony "suffice[s] to defend against . . . a motion" to compel arbitration. Objections at 15 (quoting *Barrows*, 36 F.4th at 50). Indeed, a "plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact." *Barrows*, 36 F.4th at 50 (quoting *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019)).

However, Hamilton's testimony that he did not receive any written materials during or after enrolling with MPower does not constitute an *unequivocal* denial, particularly in light of his ultimate testimony that he did not "recall any of" his MPower enrollment. *See* Hamilton Dep. at

29:12–24, 31:18–20. Indeed, he could not recall whether he signed a one-page document or a multi-page document including the Terms and Conditions as presented by opposing counsel. *Id.* at 29:25–30:23. Essentially, Hamilton testified that if the Terms and Conditions were part of what he reviewed, he would have remembered, but then later admitted that he does not remember anything he reviewed during his interaction with the Sales Representative. This testimony is hardly an unequivocal denial that he was presented with the Terms and Conditions.

Thus, the Opinion did not err in finding that no reasonable juror could credit Hamilton's denial as unequivocal. Because it is Plaintiffs' burden to demonstrate that there is a dispute of material fact over the contract formation or enforceability, and Plaintiffs' argument depends on Hamilton's testimony, the determination that Hamilton's denial could not meet the standard is fatal to their argument.

**CONCLUSION**

For the foregoing reasons, the Court DENIES the objections to the Opinion and Order at ECF No. 103 and directs the parties to arbitration. The Court also affirms Judge Wang's holdings with respect to Plaintiff Kaur and individual arbitration, because the Court finds them to be sound and Plaintiffs challenge neither. *See* Opinion at 14–15 & n.10. Within one week of the conclusion of arbitration, the parties are directed to submit a joint status letter to the Court.

Dated: September 29, 2026
White Plains, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge